(No. 26166.—)

THE SUPERIOR COAL COMPANY, Appellee, *vs.* THE DEPARTMENT OF FINANCE, Appellant.

*Opinion filed June 17, 1941—Rehearing denied September 15, 1941.*

GEORGE F. BARRETT, Attorney General, (ALBERT E. HALLETT, JR., of counsel,) for appellant.

NELSON TROTTMAN, (WILLIAM T. FARICY, of counsel,) for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, the Department of Finance, prosecutes this appeal from a judgment of the superior court of Cook county quashing its return in a *certiorari* proceeding instituted by the plaintiff, the Superior Coal Company, conformably to section 12 of the Retailers' Occupation Tax act.

Plaintiff, a domestic corporation, is a wholly owned subsidiary of the Chicago and Northwestern Railway Company, a corporation of Wisconsin, Michigan, and Illinois, and sells the entire output of its mines, except inconsequential sales to its own employees for their personal use, to the parent corporation. A tax has been paid on the sales to employees. Plaintiff resists payment of $102,730.75 in tax and penalties for the period from July 1, 1933, through May, 1935. The principal question presented for decision is whether the parent and subsidiary corporation are to be deemed as so integrated that the transactions involved in this proceeding are not taxable sales within the contemplation of our Retailers' Occupation Tax act. Defendant contends that the companies are not only separate corporations in form and in the eye of the law but, further, that the distinction between them is real and practical; that the parent corporation has enjoyed substantial advantages accruing from the separate corporate existences of the companies; that, in particular, the separate identity of the subsidiary has been an important factor in the financing of the railway company, and that to give effect to the separate identities of the two corporations is merely to recognize a distinction existing between them in fact. On the other hand, although admitting it has a separate existence for all purposes, plaintiff maintains that it is, in fact, but a

department or branch of the railway company; that it is merely an agent or instrumentality of the parent corporation; that coal mined by the plaintiff for use in the railway company's business is, in reality, mined by the railway company itself, and that the transactions in question between the plaintiff and its parent are no more "sales" than would be any interdepartmental transfer, or the direct mining by the railway company of coal for its own use through an agent, under any circumstances to which the law of agency is applicable. The determination of the decisive issue thus made requires a review of the relevant facts.

Plaintiff was incorporated in 1903, its corporate object being "to mine and sell coal, and for that purpose to acquire, own and lease such lands and acquire and hold such coal rights, and such other real and personal estate as may be necessary." Previously, the executive committee of the railway company had adopted a resolution authorizing the purchase of coal lands in Macoupin county and the board of directors had approved the transaction. The authorized capital stock, originally $1,500,000, has since been increased to $2,000,000, all of which is issued and outstanding. From the beginning, all of the stock, excepting only five directors' qualifying shares, has been owned by the railway company. Since 1903, every director of the plaintiff has been an officer or an employee of the railway company. Similarly, the officers of the plaintiff, with a single exception, have been officers of the railway company.

So far as we are able to ascertain, there is no inhibition in the general laws or special acts under which the railway company was organized forbidding it to engage in coal mining operations, incident and necessary to the operation of its business as a common carrier. When the mine properties were acquired, the railway company was obliged to purchase its coal commercially and pay, in addition to the usual seller's profit, the freight and transportation costs. Subsequent to the acquisition of the land in Macoupin

county, the railway company extended its lines and was thus enabled to reach its mines with its own rails. The purchase of the land, the formation of the coal company and the extension of the railway's lines were in accordance with its general plan to secure for itself cheaper locomotive fuel. Plaintiff has no independent income, except for limited amounts received from royalties, rents from unimportant properties, and interest from investments of accumulated funds derived originally from "sales" of coal to the railway company in the past. In short, plaintiff has no income except as the railway company supplies it with funds for the coal supplied to or purchased by it. Coal produced by the plaintiff is solely for the railway company's use and that of the latter's almost but not wholly owned subsidiary, the Chicago, St. Paul, Minneapolis and Omaha Railway Company.

It appears that the plaintiff's office has always been maintained at the general offices of the railway company. Fred S. Pfahler, president of the coal company, during the period involved in this litigation, was coal traffic manager of the railway company. Pfahler occupies offices immediately adjacent to the railway company's statistician and near the railway company's law offices. The corporate records of the plaintiff are kept in the office of the secretary, who is also the secretary of the railway company, and are part of the regular files in the office of the secretary of the railway company. Records relating to lands are kept in the office of the railway company's land commissioner. Records relative to taxes are kept by, and in, the office of the railway company's tax commissioner. Likewise, the accounting records of the coal company are kept in the office of the controller of the railway company. The controller holds the same position in both companies and neither his salary nor the salary of the accountants, bookkeepers, and clerks are paid by the plaintiff, with the exception of one accountant paid by the coal company for

"special work" at the mines. Plaintiff pays, in addition, $225 per month out of its funds for accountants' traveling expenses. The chief clerk of the coal company's president at Gillespie is an employee of the coal company and paid by it. Attorneys representing the coal company are members of the law department of the railway company. An attorney at Gillespie is employed independently for the purpose of representing the coal company in workmen's compensation proceedings. We observe, in this connection, that claims for compensation by injured employees are made against the plaintiff coal company, and not against the railway company. (*Superior Coal Co.* v. *Industrial Com.* 326 Ill. 584; 304 id. 320.) There are other instances in which the two companies are intimately affiliated but which need not be narrated. In general, the coal company does not reimburse the expenses of the railway company departments incurred in its behalf. The plaintiff coal company orders material and supplies from third parties in its own name and on its own stationery, apparently obtaining credit as a separate corporation and incurring a liability chargeable against its own assets. In communications among the officers of the two companies stationery without letterheads is used, the practice which obtains in interdepartmental correspondence of the railway company, but which is not the practice of either company concerning outside correspondence. The fact remains that the records, inventory, property and funds of the two companies are kept separately, although often in the same offices and by the same individuals.

The railway company has long been in bankruptcy in the United States District Court for the Northern District of Illinois, Eastern Division, and its assets are held by a trustee. Plaintiff coal company is, so far as the record discloses, a solvent corporation, has never been adjudicated a bankrupt and is presently operating as a going concern. In 1932, the railway company borrowed money from the

Reconstruction Finance Corporation and, as security, made an assignment of the dividends to be declared upon its stock of the coal company. The financing contemplated the repayment of the loan to the extent of $400,000 per year, the railway company agreeing to make a contract with the plaintiff coal company to take 2,000,000 tons of coal per year at a price twenty cents per ton in excess of the cost of production. By an agreement between the two corporations, the coal company agreed to declare dividends to the extent of $400,000 per year. The contract was assigned by the railway company to the Reconstruction Finance Corporation. A formal direction was given to the plaintiff coal company to pay dividends to the Federal agency so long as the railway company was indebted to the latter and the plaintiff executed an acquiescence. Upon the foregoing basis, the railway company obtained the desired loan. The contract with respect to the declaration and payment of dividends was abrogated in the latter part of 1934 at the request of the railway company. Thereafter, coal was sold to the buyer at cost of operation.

It also appears that prior to December, 1934, the railway company made a pledge of equity in the stock of the plaintiff to the Railroad Credit Corporation to secure a debt. In 1934, the railway company borrowed money from banks in New York City. At the request of the railway company, the plaintiff pledged bonds issued by the railway company and held by it, the plaintiff, to secure the loans to the parent corporation. Interest on the bonds was paid to the coal company and retained by it as an asset thereby disclosing that the plaintiff held these bonds as a separate and distinct corporation, and, conversely, that the railway company was not holding its own bonds.

During the years of Federal control of the railroad companies, the Federal Administrator did not succeed to and assume operation of the plaintiff's properties. Plaintiff sold coal to the parent corporation exclusively during

this period, it appearing that the Omaha subsidiary was then obtaining its coal elsewhere. There was no change in the personnel of the officers of the two companies and the character of the directorate was maintained throughout this period.

The practice attending the sales of coal by the plaintiff to the railway company merits scrutiny. The railway company's purchasing agent sends an order for coal to the office of the president of the coal company in Chicago, and the president forwards it to his office in Gillespie where the mines are located. Plaintiff's chief clerk at Gillespie telephones instructions to the mines in accordance with the letter from the purchasing agent. A manifest is made at the mines, we quote: "As to his handling and as he telephones he marks as the cars are loaded on the manifest in accordance with the instructions· of the purchasing department where to bill the cars." The train crew picks up this manifest, takes it to the mines and moves the cars noted on·the manifest to the main line. The president of the coal company adds, we quote: "The reason we move all our cars for the main line of trains, the agent from the Chicago and Northwestern Railway Company from the manifest makes what we may call waybills for each individual car which shows the destination, and the conductors of the trains move the individual cars on the waybills to the points called for." The coal company keeps an invoice record showing the total tonnage and the prices which its president fixes to cover the necessary money to meet current expenses. It receives checks from the railway company and deposits them in its own bank accounts. According to plaintiff's president, collections from accounts receivable are carried under "accounts receivable" and not in any "sales account." As the enforcement officer at the departmental hearings found, all the requisite elements of a sale are present. There is a seller, the coal company, a buyer, the railway company, and an agreement between them provid-

ing for the sale of coal by the former to the latter at a specified price. The seller, the coal company, transfers ownership of or title to coal to the buyer, the railway company, for use or consumption and not for resale, for a valuable consideration. The coal company sets up an account receivable in the name of the railway company to cover sales of coal to it. Debits are made to this account receivable covering coal sold by the coal company to the railway company and credit postings are made to this same account upon receipt of payments, whether by vouchers, cash, or otherwise. Further, the coal company issues invoices to the railway company covering all sales of coal by it to the latter and, after receiving these invoices, the railway company, from time to time, makes payments in satisfaction of the transactions represented thereby.

The question is presented as to whether the foregoing facts and circumstances warrant disregard of the fiction of the corporate entity. As a general rule a corporation and its stockholders are deemed separate entities, and this is true in respect to tax problems. (*New Colonial Ice Co. v. Helvering,* 292 U. S. 435.) Ownership of capital stock in one corporation by another does not, itself, create an identity of corporate interest between the two companies, nor render the stockholding company the owner of the property of the other, nor create the relation of principal and agent, representative, or *alter ego* between the two. (*United States* v. *Delaware, Lackawanna and Western Railroad Co.* 238 U. S. 516; *Pullman's Palace Car Co.* v. *Missouri Pacific Railway Co.* 115 id. 587; *Owl Fumigating Corp.* v. *California Cyanide Co.* 24 Fed. (2d) 718; *Richmond & Irvine Construction Co.* v. *Richmond, Nicholasville, Irving and Beattyville Railroad Co.* 68 Fed. 105.) Nor does the identity of officers of two corporations establish identity of the corporations. (*Owl Fumigating Corp.* v. *California Cyanide Co. supra.*) In *Commerce Trust Co.* v. *Woodbury,* 77 Fed. (2d) 478, the court observed:

"But notwithstanding such situation and such intimacy of relation, the corporation will be regarded as a legal entity, as a general rule, and the courts will ignore the fiction of corporate entity only with caution, and when the circumstances justify it, and when it is used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud." Again, it has been said: "It is not enough, however, that the shareholders and officers or managers in the corporations are identical, and the mere fact that one owns all the stock of the other, or substantially all, is not enough to warrant disregard. Common officers and management is not incompatible with separate entities, or conclusive of identity; nor a difference in officers and stockholders conclusive of distinct entities." (1 Fletcher on Corporations, sec. 43.) Moreover, where corporations meticulously observe the formalities incident to separate corporate existence and receive substantial economic benefits therefrom, they will not be permitted to disregard the distinction for the purpose of avoiding the burdens likewise incident to the maintenance of separate corporate identities. *Fourche River Lumber Co.* v. *Bryant Lumber Co.* 230 U. S. 316, 323; *Fraw Realty Co.* v. *Natanson,* 261 N. Y. 396, 406.

*In re Bush Terminal Co.* 93 Fed. (2d) 661, sustains defendant's position. In the case cited, the city of New York claimed a tax upon the gross receipts derived from sales of steam by a wholly owned subsidiary to its parent corporation. Sustaining the city, the Circuit Court of Appeals for the Second District said: "The stock of the Bush Terminal Buildings Company, with whom it has common officers and directors, is owned by the Bush Terminal Company. It has a steam plant, built by the Bush Terminal Company on its land, and by which it produces the steam here in question. Appellee supplies the steam to the Bush Terminal Company at cost. The testimony is clear that the transaction is a sale and was treated by both companies in their books and account as such. The Bush Terminal

Company resells some of the steam to its tenants. The steam is measured with meters when sold to the Bush Terminal Company. The debtor and the appellant are separate entities, and there is no occasion to apply the rule which allows the corporate fiction to be disregarded. It should be preserved here. [Citations] The intercorporate relations of the two companies may have been arranged to gain certain advantages, but that will not avoid the tax in this case. (See Douglas & Shanks, 'Insulation from Liability through Subsidiary Corporations,' 39 Yale Law Journal, 193.) There is no legal obstacle against regarding the sale of this steam from a subsidiary to a parent company as a purchase and sale. Since the subsidiary sold or furnished steam to the parent company, the sale is taxable under Local Law No. 21 of 1934 as amended by Local Law No. 2 of 1935. The appellant and its parent company's plan of separate corporations for the conduct of their various activities presumptively is for some gain or advantage, and being separate entities, under the circumstances, appellant is not permitted to deny the right of the appellee to tax for the services rendered." Similarly, the separate corporate existence of the two companies has been established and long preserved in the present case, and each corporation has obviously secured substantial economic benefits from its separate existence.

Plaintiff places principal reliance upon *Consolidated Indiana Coal Co.* v. *National Bituminous Coal Com.* 103 Fed. (2d) 124, and has exhaustively and, indeed, exhaustingly, reviewed the facts and law of the case cited. It states that there is no distinction in principle between the question decided and the one presented for our determination, and, further, that rarely is a factual parallel between two cases so close. There, a coal mining company, the Consolidated Indiana Coal Company, was a wholly owned subsidiary of the Chicago, Rock Island and Pacific Railway Company. All of the coal company's stock, with the exception of

qualifying shares, was issued to the parent railway company on whose behalf the subsidiary held title to bituminous coal properties and leases. This was done to the end that the railway company might have a cheaper and more dependable supply of fuel for its operations. Section 4-II(1) of the Bituminous Coal act of 1937 exempts from its provisions "coal consumed by the producer or * * * transported by the producer to himself for consumption by him." The Circuit Court of Appeals for the Seventh Circuit held that the coal company was the agent of the railway company's bankruptcy trustees in the production of coal and, consequently, entitled to exemption from the requirements of the Bituminous Coal act. These observations were made: "The conclusion is inescapable that petitioner was the agent of the trustees in the production of coal, and this is true irrespective of whether petitioner and the Railway Company be considered as separate and distinct corporations, or whether, under the circumstances, they be considered as merged. * * * In the instant situation, the trustees of the Railway Company could produce coal only by agents, and we discern nothing to preclude a corporation from being the agency thus utilized. We, therefore, are of the opinion that the coal involved in this proceeding was produced by the trustees by and through the agency of petitioner, and that it is consumed by the trustees in the operation of its railroad. Being both the producer and the consumer of the coal, it is entitled to the exemption provided in section 4-II(1) of the act." On the other hand, the most recent expression of the Circuit Court of Appeals is diametrically in conflict with the case relied upon by plaintiff and supports the defendant. In *Keystone Mining Co.* v. *Gray*, No. 7497, decided by the Circuit Court of Appeals for the Third Circuit, April 22, 1941, the Keystone Mining Company, a Pennsylvania corporation, was wholly owned and controlled by the Delaware, Lackawanna and Western Railroad Company. It owns coal-mining prop-

erties in Pennsylvania and produces coal from its mines at cost for use in the locomotives of the Lackawanna Railroad Company. On facts closely paralleling those in the earlier decision cited by plaintiff, the Keystone company sought exemption from the provisions of sections 4 and 4-A of the Bituminous Coal act by virtue of section 4, II(1) with respect to the coal produced and disposed of by it. The coal company contended that it was a wholly owned agency of the railroad company, having but one function, the production of coal for the railroad company's use at cost, and that since such was its status it was entitled to the exemption provided by the applicable statute. The *Consolidated Indiana Coal Co. case* was relied upon by the Keystone company but was not deemed controlling. Rejecting the coal company's contention, the court said: "It is obvious that a literal interpretation of section 4 II(1) will not allow the petitioner to be relieved of the burdens of sections 4 and 4-A for the coal produced by the petitioner is not consumed by it or transported by it to itself. Quite the opposite is in fact the case, for substantially all the coal produced by the petitioner is produced for the benefit of Lackawanna Railroad Company, is transported to that company and is disposed of to it." The court declined to invoke the agency rule, as urged by the coal company, observing: "The agency rule is an instrumentality for piercing the veil of the corporate entity, a fiction oddly (The word 'oddly' is our tribute to the intricacy of the judicial mind. The captious person might inquire whether the piercing of the corporate veil was a fiction or whether the corporate veil, itself, was a fictitious veil. We think, however, that the coal producer is bent on rending its fictitious veil with a fictitious instrumentality) employed to look through a fiction. * * * We conclude that the agency rule should not be applied and that corporate entity should not be disregarded in order to avoid the effect of a statute enacted in the public interest. We think that where a

remedial statute is involved the purpose of the legislature must be kept in view and that the agency rule should not be applied in derogation of the plain intention of the legislature." The fact situation in the *Keystone case* parallels the facts in the case at bar as closely as the *Consolidated Indiana Coal Co. case* and is not only equally authoritative but is the latest decision analogous to the present case.

There have been instances, as plaintiff asserts, involving unusual circumstances in which the corporate form has been disregarded. (*Gulf Oil Corporation* v. *Lewellyn,* 248 U. S. 71; *Chicago, Milwaukee and St. Paul Railway Co.* v. *Minnesota Civic Association,* 247 id. 490; *Southern Pacific* v. *Lowe,* 247 id. 330; *Commerce Trust Co.* v. *Woodbury, supra; State* v. *St. Paul Union Depot Co.* 42 Minn. 142.) Apart from the peculiar fact situations in some of the foregoing cases, many of them being income tax cases and, hence, essentially different and not authoritative in occupation tax matters, those decisions do not purport to announce any general rule sanctioning disregard of the corporate entity in respect to taxation. As has been pertinently observed, (*Pickwick Corp* v. *Welch,* 21 Fed. Supp. 664) : "The doctrine of corporate entity is one of substance and validity; it should be ignored with caution, and only when the circumstances clearly justify it. The theory of the *alter ego* has been adopted by the courts to prevent injustice, in those cases where the fiction of a corporate entity has been used as a subterfuge to defeat public convenience or to perpetrate a wrong; it should never be invoked to work an injustice; or to give an unfair advantage."

This opinion need not be further extended by analysis of the numerous authorities cited by the parties. It suffices to observe that none of the remaining cases cited are parallel, and few analogous, to the facts and circumstances in the case at bar. Illinois precedents are wanting. Under these circumstances, the solution of the novel issue presented for decision must be made in the light of basic prin-

ciples of corporate law and the objective of our Retailers'
Occupation Tax act. First, the plaintiff and the railway
company are, admittedly, separate entities. It may well
be that particular factual situations, as plaintiff insists, will
justify the disregard of the corporate entities of parent and
subsidiary corporations in order to prevent fraud. No such
situation, however, obtains here. The plain purpose of the
Retailers' Occupation Tax law is to exact a tax from those
engaged in the business of making retail sales in this State.
The parties, for purposes of their own, have consistently
employed the vehicle of a sale, within the accepted idea of
this commercial transaction, using familiar *indicia* of sales,
namely, invoices, waybills, remittances, and entries in ac-
counts. Plaintiff's argument that the separate corporate
entities were of no economic benefit to the railway com-
pany because it could have accomplished the same ends by
other means is without merit, for the ample reason that it
did not employ the other means, if any, at its command.
Having utilized separate corporate forms for nearly forty
years, having undoubtedly secured financial and economic
advantages as a result during this period, and having con-
sistently employed the legal habiliments incident to a sale
in the transactions involved in this litigation, thereby evi-
dencing its real intent, we are of the opinion that the
plaintiff is not now in a position to renounce its separate
corporate entity and ask that its separate corporate exist-
ence be disregarded at the expense of the State. The Gen-
eral Assembly has not seen fit to exclude sales between
affiliated corporations and, in particular, from a subsidiary
corporation to its parent corporation. Manifestly, we can-
not, by a tortuous construction of the law, create such
an exemption.

A second contention of the plaintiff requires considera-
tion. During the period involved in this controversy,
namely, July 1, 1933, to June 1, 1935, 57.1 per cent of the
coal mined, sold and delivered in Illinois to the railway

company, measured in terms of money, was delivered for use outside the State. Plaintiff argues, accordingly, that its shipments of coal to the railway company in Illinois, but destined for points outside of Illinois, were shipments in interstate commerce and, hence, not subject to the retailers' occupation tax. Section 2 of the statute (Ill. Rev. Stat. 1939, chap. 120, par. 441, p. 2669) declares that the tax "is not imposed upon the privilege of engaging in any business in interstate commerce or otherwise, which business may not, under the constitution and statutes of the United States, be made the subject of taxation by this State." It is undisputed that all of the coal sold by the plaintiff to the railway company is loaded into the latter's cars on its tracks at its mines near Gillespie. The railway company, it thus appears, obtains complete possession of the coal in its cars in Illinois at the mines. It is immaterial that coal mined and delivered to the railway company in this State was intended for use beyond the territorial boundaries of Illinois. Here, the fact that a portion of the coal delivered to the railway company used in other States is of no greater significance, within the contemplation of the Retailers' Occupation Tax act, than the fact that wearing apparel purchased in Illinois may later be worn in Florida or California. As the late Mr. Justice Holmes of the United States Supreme Court pointedly observed in *Superior Oil Co.* v. *Mississippi,* 280 U. S. 390: "Here the gasoline was in the hands of the purchaser to do with as it liked, and there was nothing that in any way committed it to sending the oil to Louisiana except its own wishes. If it had bought bait for fishing that it intended to do itself, the purchase would not have been in interstate commerce because the fishing grounds were known by both parties to be beyond the State line." The inescapable fact is, as urged by the defendant, that the railway company took possession of the coal at the mines as purchaser, and not as a mere bailee. No duty rested upon the plaintiff to ship

coal beyond the boundaries of Illinois in order to complete its contract of sale. Indeed, evidence is wanting that the plaintiff did actually deliver coal to any point outside of the State. The coal company indicated its intention in this regard by receiving no bill of lading and paying no freight and, on the other hand, the railway company manifested its intent by designating coal so purchased on its own waybills as "company freight" from that point on. The waybill contained a form for directions: "Name of Dept. by which articles are to be used." Obviously, the designation of the coal as "company freight" and the direction concerning its use by a named department demonstrate disposition of the coal by an owner in possession of the commodity. Furthermore, the coal company billed the railway company for the coal at the place of delivery. It does not appear that the railway company ever made any charge for its transportation of the coal as "company freight" from the mines to the point of ultimate destination for actual consumption by it. The expressed intent of the parties, confirmed by their actions, discloses that the railway company took possession of the coal as purchaser when the coal was loaded on its own cars at the mines. The railway company was vested with complete dominion of the coal when it was placed on its cars at plaintiff's mines and the successive sales, without question, were consummated in Illinois. Section 2 of the Retailers' Occupation Tax act, it follows necessarily, is not a bar to the challenged tax.

We are not unmindful of the fact that recent decisions of the Supreme Court of the United States have changed the concept of "interstate commerce" as reflected in earlier decisions. The result is, in effect, that many transactions long deemed to have been wholly intrastate are now held to partake of an interstate character. The pendulum has swung far and perhaps it is now swinging back to center. It can be argued that since smoke from a locomotive of the railway company in the case at bar may sometimes

travel into the neighboring State of Iowa, a substantial portion of the sales of coal from plaintiff to the railway company's transactions is in interstate commerce. We are constrained to conclude, however, that the sales of coal by plaintiff to the railway company are not interstate transactions unless recognized distinctions between interstate and intrastate commerce be discarded. This, we can not do.

The judgment of the superior court is reversed and the cause is remanded, with directions to quash the writ of *certiorari* and to render judgment in favor of the defendant and against the plaintiff for $102,730.75.

*Reversed and remanded, with directions.*