## GRAY, DIRECTOR OF THE BITUMINOUS COAL DIVISION OF THE DEPARTMENT OF THE INTERIOR, ET AL. v. POWELL ET AL., RECEIVERS.

No. 18. Argued October 21, 22, 1941.—Decided December 15, 1941.

*Mr. Robert L. Stern,* with whom· *Assistant Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Richard H. Demuth, Arnold Levy, Jesse B. Messitte,* and *Abe Fortas* were on the brief, for petitioners.

*Mr. W. R. C. Cocke,* with whom *Messrs. Jos. F. Johnston* and *Wm. H. Delaney* were on the brief, for respondents.

MR. JUSTICE REED delivered the opinion of the Court.

Respondents, receivers of the Seaboard Air Line Railway Company, seek from the Bituminous Coal Division of the Department of the Interior an exemption of certain coal [1] from the Bituminous Coal Code on the ground that they were both the producer and consumer of the coal. If Seaboard is held to be a producer-consumer, it is entitled to an exemption by virtue of § 4–II (1) and § 4–A. These sections, together with others pertinent to the discussion, are set out in a note below.[1]

---

[1] Bituminous Coal Act of 1937, 50 Stat. 72, 15 U. S. C. § 828 *et. seq.* (1940). "SEC. 3. (a) There is hereby imposed upon the sale or other disposal of bituminous coal produced within the United States when sold or otherwise disposed of by the producer thereof an excise tax of 1 cent per ton of two thousand pounds.

"The term 'disposal' as used in this section includes consumption or use (whether in the production of coke or fuel, or otherwise) by a producer, and any transfer of title by the producer other than by sale.

"(b) In addition to the tax imposed by subsection (a) of this section, there is hereby imposed upon the sale or other disposal of bituminous coal produced within the United States, when sold or otherwise disposed of by the producer thereof, which would be subject to the

The application for exemption was filed before the National Bituminous Coal Commission August 4, 1937. The first hearing was in September, 1937, before the examiners for the Commission. After the passage of the Reorganization Act of 1939, 53 Stat. 561, and the acquiescence of Congress in Reorganization Plan No. II, 53 Stat. 1433, a

application of the conditions and provisions of the code provided for in section 4, or of the provisions of section 4-A, an excise tax in an amount equal to 19½ per centum of the sale price at the mine in the case of coal disposed of by sale at the mine, or in the case of coal disposed of otherwise than by sale at the mine, and coal sold otherwise than through an arms' length transaction, 19½ per centum of the fair market value of such coal at the time of such disposal or sale. In the case of any producer who is a code member as provided in section 4 and is so certified to the Commissioner of Internal Revenue by the Commission, the sale or disposal by such producer during the continuance of his membership in the code of coal produced by him shall be exempt from the tax imposed by this subsection.

. . . . .

"SEC. 4. The provisions of this section shall be promulgated by the Commission as the 'Bituminous Coal Code', and are herein referred to as the code.

"Producers accepting membership in the code as provided in section 5 (a) shall be, and are herein referred to as, code members, and the provisions of such code shall apply only to such code members, except as otherwise provided by subsection (h) of part II of this section.

"For the purpose of carrying out the declared policy of this Act, the code shall contain the following conditions and provisions, which are intended to regulate interstate commerce in bituminous coal and which shall be applicable only to matters and transactions in or directly affecting interstate commerce in bituminous coal:

. . . . .

PART II—MARKETING.

. . . . .

"(e) No coal subject to the provisions of this section shall be sold or delivered or offered for sale at a price below the minimum or above the maximum therefor established by the Commission, and the sale or delivery or offer for sale of coal at a price below such minimum or above such maximum shall constitute a violation of the code: *Pro-*

division headed by a Director was established by the Secretary of the Interior, known as the Bituminous Coal Division. Order No. 1394, as amended by Order No. 1399 of July 5, 1939, 4 F. R. 2947. Thereafter, the hearings proceeded before the Division, and the order denying the exemption was passed by the Director, June 14, 1940.

---

*vided,* That the provisions of this paragraph shall not apply to a lawful and bona fide written contract entered into prior to June 16, 1933.

.        .        .        .        .

"(l) The provisions of this section shall not apply to coal consumed by the producer or to coal transported by the producer to himself for consumption by him.

"SEC. 4–A. Whenever the Commission upon investigation instituted upon its own motion or upon petition of any code member, district board, State or political subdivision thereof, or the consumers' counsel, after hearing finds that transactions in coal in intrastate commerce by any person or in any locality cause any undue or unreasonable advantage, preference, or prejudice as between persons and localities in such commerce on the one hand and interstate commerce in coal on the other hand, or any undue, unreasonable, or unjust discrimination against interstate commerce in coal, or in any manner directly affect interstate commerce in coal, the Commission shall by order so declare and thereafter coal sold, delivered or offered for sale in such intrastate commerce shall be subject to the provisions of section 4.

"Any producer believing that any commerce in coal is not subject to the provisions of section 4 . . . may file with the Commission an application, verified by oath or affirmation for exemption, setting forth the facts upon which such claim is based. . . . Within a reasonable time after the receipt of any application for exemption the Commission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of such application. . . . Any applicant aggrieved by an order denying or otherwise disposing of an application for exemption by the Commission may obtain a review of such order in the manner provided in subsection (b) of section 6.

.        .        .        ..        .

"SEC. 6. . . .. (b) Any person aggrieved by an order issued by the Commission in a proceeding to which such person is a party may obtain a review of such order in the Circuit Court of Appeals of the United States, within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the

Better practice might have suggested a dismissal, since the Director found Seaboard was not a producer. Subsequently, Seaboard sought review under § 6 (b) and obtained the decree, now under consideration, reversing the Director's order. The opinion accompanying the decree held that the facts of this case brought the Seaboard under the classification of producer. 114 F. 2d 752. As the question of federal law was important [2] and unsettled by any decision of this Court, certiorari was granted, J. C. § 240 (a), 311 U. S. 644, and the decree below affirmed by an equally divided Court, 312 U. S. 666. The present consideration is upon a petition for rehearing. 313 U. S. 596.

Seaboard, a coal-burning railroad, is a large consumer of bituminous coal. The arrangements here in question

District of Columbia, by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall be forthwith served upon any member of the Commission and thereupon the Commission shall certify and file in the court a transcript of the record upon which the order complained of was entered. Upon the filing of such transcript such court shall have exclusive jurisdiction to affirm, modify, and enforce or set aside such order, in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged below. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. . . .

"Sec. 17. As used in this Act—

"(c) The term 'producer' includes all individuals, firms, associations, corporations, trustees, and receivers engaged in the business of mining coal."

The Bituminous Coal Act of 1937, 50 Stat. 72, has been extended to April 26, 1943. Act of April 11, 1941, c. 64, 55 Stat. 134.

[2] Cf. *Consolidated Indiana Coal Co.* v. *National Bituminous Coal Commission*, 103 F. 2d 124; *Keystone Mining Co.* v. *Gray*, 120 F. 2d 1, decided after allowance of certiorari.

are with three mines; but as there are no significant differences in the plans by which the coal is extracted, we shall describe the contracts relating to one only, the William-Ann Mine, owned by the United Thacker Coal Company and the Cole and Crane Real Estate Trust.

This was the earliest arrangement. It originated in May, 1934, when the coal code of the National Industrial Recovery Act was in effect.[3] The first step was a lease of coal lands by the Seaboard from the landowners which granted to Seaboard the right to mine coal for fourteen months, with the privilege of yearly renewals, which originally were not to run beyond June 30, 1939. Successive extensions have continued its effect since that time. During the spring of 1936, two extensions of six weeks each were agreed upon, specifically in view of the case of *Carter* v. *Carter Coal Co.*, 298 U. S. 238, decided May 18, 1936. The *Carter* case involved the Bituminous Coal Act of 1935, the predecessor of the present act. A per-ton royalty, as rent, was reserved to the landowners with an annual minimum of $16,200 payable quarterly. The lease was terminable on fifteen days notice, if the landowners terminated the contractor's lease, about to be referred to, for the contractor's default.

The second step in this arrangement was for the landowner lessors of the lease just described to lease simultaneously to a contractor selected by Seaboard the mining equipment on the demised premises, consisting of buildings, tipples, machinery and other appurtenances necessary or convenient for extracting the coal. This equipment was sufficient for reasonably economical mining. It was further provided in the coal lease that the term and

[3] National Recovery Administration, Registry No. 702–45, Approved Code No. 24, Code of Fair Competition for the Bituminous Coal Industry, promulgated September 18, 1933. Article VI listed selling below code price as an unfair practice.

the renewal privileges of the equipment lease should be coëxtensive with those of the coal lease.

The final step was an operating contract between the contractor, Daniel H. Pritchard, referred to in the land lease as the lessee of the facilities for mining, and Seaboard for the extraction of the coal by the contractor or supplier and the delivery of it to Seaboard for consumption. This contract also was made simultaneously with the coal lease. It contained a provision requiring the contractor to obtain a lease of the mining equipment, in accordance with that segment of the entire plan referred to in the preceding paragraph. For a flat per-ton cost on a sliding scale dependent upon volume, the supplier agreed to mine the coal. His compensation was subject to variation by fluctuations in costs beyond his control, such as taxes, wages, machinery and explosives. Alternatively, payment could be made on a cost basis plus ten cents per ton for the contractor's compensation. This operating contract ran for the same term and had the same renewal privileges as the coal lease contract heretofore described and has been continued in effect by extensions made for the same terms as the extensions of the coal lease. The supplier was called an independent contractor in the document. This he was, at least in the sense that he managed the mining in his own way without a right of direction in Seaboard. He agreed that the coal supplied would be clean, i. e., free of non-combustible matter, and would pass inspection of Seaboard for compliance with its specifications. The supplier paid and assumed all obligations to the landowner except the royalty, including taxes. He carried employer's liability and casualty insurance, and agreed to bear the cost of all repairs, additions or betterments, even under the alternate cost-plus plan, as well as those described as commissary or welfare expenses. Seaboard, in an extension agreement, obtained the privilege of termination on sixty days' notice, if the supplier

defaulted by not lowering his contract price to meet the market price of similar coal.

The landowner, the contractor and Seaboard, by this series of coördinated and synchronized contracts, caused the entire output of the mine to be delivered to Seaboard for its consumption, at a fixed price, subject to variations for factors beyond the supplier contractor's control. The alternative cost-plus plan was not employed. Under the contractor's agreement, the contractor assumed all risks of operation, as heretofore explained, and all obligations of Seaboard to the landowner, except the royalty payments. This made a fixed cost to Seaboard, for coal, of supplier's contract price plus the royalty per ton as rent. It was a short term, one year, contract with the price controlled by the market in view of the competitive price provision. Seaboard furnished no facilities or equipment for mining or loading.

The other two arrangements, one with the Glamorgan Coal Lands Corporation, landowner, and Glamorgan Coals, Inc., the operator, for which latter corporation Peerless Coal Corporation is substituted by consent, and the other with Chilton Block Coal Company and the Dingess-Rum Coal Company, landowners by lease and in fee, and Daniel H. Pritchard, operator, vary only in details from the William-Ann contracts set out above.

From the several arrangements the Seaboard obtained about half of its annual requirements, estimated for 1936 at one million tons. There is no question as to the interstate character of the commerce involved. The coal is mined in Virginia and West Virginia, and consumed in a number of other South Atlantic states.

The Bituminous Coal Act of 1937 followed the invalidation of the Bituminous Coal Conservation Act of 1935 by *Carter* v. *Carter Coal Co.*, 298 U. S. 238, and the abandonment of the N. R. A. Code of Fair Competition after the decision in *Schechter Corp.* v. *United States,* 295 U. S.

495. These legislative enactments sought a solution of the economic difficulties of the soft coal industry, which were bringing bankruptcy to operators and an even worse condition, unemployment, to the miners. Each time legislation was attempted, the conclusion was reached that price stabilization offered the best remedy. The industry found the same answer. *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344. This Court has determined that the present 1937 act is within the constitutional powers of Congress. *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381.

This purpose of stabilization of conditions through a fixed price scheme met a difficult problem in the captive coal mines. The 1935 act taxed the value of such coal at the mine. It defined captive coal as including "all coal produced at a mine for consumption by the producer or by a subsidiary or affiliate thereof." 49 Stat. 1008. As the coal consumed by a producer apparently was deemed by Congress, when considering the present act, not to offer the same disturbing effect to prices as non-code, open market coal,[4] a method of exemption was provided. §§ 4–II (1) and 4–A, note 1, *supra.* Congress, however, did not define exempt coal as it had captive coal in the 1935 act. While a definition was inserted in the Senate,[5] it

---

[4] Testimony of Chairman Hosford of the Bituminous Coal Commission, Hearings before Committee on Interstate Commerce, U. S. Senate, 74th Cong., 2nd Sess., on S. 4668, pp. 32 and 33.

[5] 81 Cong. Rec. 3136, 75th Cong., 1st Sess.

"It is proposed, on page 30, line 17, to strike out the period after the word 'him', and to insert a comma and the words 'and for the purpose of this subsection the term 'producer' also includes all individuals, partnerships, and corporations which are found by the Commission, upon the effective date of this act, bona fide and not for the purpose of evading the provisions of this act, to be owned by, or to be under common ownership with, a producer, provided such a producer does not sell any part of his production on the commercial market.' . . . The purpose of the amendment is simply to extend the exception

was eliminated in the conference report.[6]   As a result, the determination of exempt coal was left to the administrative body.   § 4–A, note 1, *supra.*

*Determination of Producer.*—We are thus brought squarely to decide whether the Director's finding that Seaboard is not the producer of this coal is to be sustained. By § 4–A, note 1, *supra,* the determination of this issue rests with the Director, subject to the review, as obtained herein, by a Circuit Court of Appeals, provided by § 6 (b). Section 4–A states: "Any producer believing that any commerce in coal is not subject to the provisions of section 4 . . . may file with the Commission an application, verified by oath or affirmation for exemption, setting forth the facts upon which such claim is based.  . . .   Within a reasonable time after the receipt of any application for exemption the Commission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of such application."   In a matter left specifically by Congress to the determination of an administrative body, as the question of exemption was here by §§ 4–II (1) and 4–A, the function of review placed upon the courts by § 6 (b) is fully performed when they determine that there has been a fair hearing, with notice and an opportunity to present the circumstances and arguments to the decisive body, and an application of the statute in a just and reasoned manner.   *Shields* v. *Utah Idaho R. Co.,* 305 U. S. 177, 180, 181, 184, 185, 187.

Such a determination as is here involved belongs to the usual administrative routine.   Congress, which could have

carried by subsection (1), on page 30, so as to include under the definition of the word 'producer' a wholly owned subsidiary or other legal entity having identical ownership.   That is the whole purpose.

"The question is on agreeing to the amendment offered by the Senator from Ohio.

"The amendment was agreed to."

[6] H. Rep. No. 578, 75th Cong., 1st Sess., pp. 1, 8.

legislated specifically as to the individual exemptions from the code, found it more efficient to delegate that function to those whose experience in a particular field gave promise of a better informed, more equitable, adjustment of the conflicting interests of price stabilization upon the one hand and producer consumption upon the other. By thus committing the execution of its policies to the specialized personnel of the Bituminous Coal Division, the Congress followed a familiar practice.[7] Of course, there is no difference between the skill of employees in a division of a department and those in a board, commission or administration.

Where, as here, a determination has been left to an administrative body, this delegation will be respected and the administrative conclusion left untouched. Certainly, a finding on Congressional reference that an admittedly constitutional act is applicable to a particular situation does not require such further scrutiny. Although we have here no dispute as to the evidentiary facts, that does not permit a court to substitute its judgment for that of the Director. *United States* v. *Louisville & Nashville R. Co.,* 235 U. S. 314, 320; *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 304; *Helvering* v. *Clifford,* 309 U. S. 331, 336. It is not the province of a court to absorb the administrative functions to such an extent that the executive or legislative agencies become mere fact-finding bodies deprived of the advantages of prompt and definite action.

Congress could not "define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. Just as in the *Adkins* case [310 U. S. 381] the determination of the sweep of the term "bituminous

---

[7] Treasury—*United States* v. *Johnston,* 124 U. S. 236, 249; Interior— Swamp lands—*Northern Pacific Ry. Co.* v. *McComas,* 250 U. S. 387, 392; Customs Appraisers—*Passavant* v. *United States,* 148 U. S. 214, 219; Post Office—*Bates & Guild Co.* v. *Payne,* 194 U. S. 106.

coal" was for this same administrative agency, so here there must be left to it, subject to the basic prerequisites of lawful adjudication, the determination of "producer." The separation of production and consumption is complete when a buyer obtains supplies from a seller totally free from buyer connection. Their identity is undoubted when the consumer extracts coal from its own land with its own employees. Between the two extremes are the innumerable variations that bring the arrangements closer to one pole or the other of the range between exemption and inclusion. To determine upon which side of the median line the particular instance falls calls for the expert, experienced judgment of those familiar with the industry. Unless we can say that a set of circumstances deemed by the Commission to bring them within the concept "producer" is so unrelated to the tasks entrusted by Congress to the Commission as in effect to deny a sensible exercise of judgment, it is the Court's duty to leave the Commission's judgment undisturbed.

Consumers of bituminous coal are naturally desirous of obtaining supplies free of the tax and free of the risk and investment typical of production. If independent contractors are employed for extraction, there is an obvious breach in the full consumer-producer identity. This may create consequences which would not follow if the enterprise itself, through its own employees, accomplished the same ultimate result. Often in the law, the selection of a particular business form as, for instance, carrying on a common business through two corporations, may create legal liability, *Edwards* v. *Chile Copper Co.*, 270 U. S. 452, 456, although such relation to other connections may result in diversity of legal treatment. Compare, for instance, *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, and *United States* v. *Delaware, L. & W. R. Co.*, 238 U. S. 516.

The shortness of the leases, the freedom from investment in coal lands or mining facilities, the improbability of profit or loss from the mining operations, the right to cancel when cheaper coal may be obtained in the open market, all deny the position of producer to the railroad.

We view it as immaterial that the Company might have itself operated a captive mine and so escaped the price provisions of the act by virtue of the exception of § 4–II (1), note 1, *supra*. It chose to employ the scheme in question here. It considered it advantageous to avoid the risks of production and now must bear the burdens of a determination that other entities than itself are the producers. Cf. *Superior Coal Co.* v. *Department of Finance*, 377 Ill. 282, 36 N. E. 2d 354, 358, 360. The choice of disregarding a deliberately chosen arrangement for conducting business affairs does not lie with the creator of the plan. *Higgins* v. *Smith*, 308 U. S. 473, 477.

*Code Coverage.*—Seaboard contends that the coal here involved is not affected by the code § 4–II because there is no sale or other transfer of the title to the coal by the producer. As to this point, in Seaboard's view, since it as lessee of the mineral rights is the owner of the coal when it is extracted and until it is consumed and therefore no title ever passes, it is immaterial whether or not it or its suppliers of the coal are determined to be the producer. Support for the conclusion that there must be a transfer of title to bring the coal under the code, § 4–II, is found by Seaboard in the preoccupation of Congress in sales, which attitude it feels is shown by the continuous reference in the provisions of the Act to sales or other transfers of title. Further support is drawn for the position by reference to § 3 (a), where "disposal" is declared to include consumption by a producer or any transfer of title other than by sale. Reliance is placed also on § 3 (b), which by a tax of 19½ per cent of the selling price impels adherence to the code when coal "which would be subject

to the application of the conditions and provisions of the code provided for in section 4, or of the provisions of section 4–A" is sold or otherwise disposed of by the producer.

Had we held that Seaboard was the producer, the pertinency of this argument would disappear because Seaboard would be both producer and consumer, and therefore this coal would be entitled to exemption under §§ 4–II (1) and 4–A. As we determine otherwise, however, it is essential to examine the soundness of the position asserted by Seaboard, to wit, that coal produced by the instrumentalities is not subject to the provisions of § 4–II for the reason that it is not sold nor otherwise disposed of by the producers. We conclude that coal extracted under the circumstances of this case is within the scope of the code provisions of § 4–II.

Examination of the code discloses that minimum prices for code coal are fixed by joint action of the district boards and the Director. § 4–I (a), II (a). Thereafter no code coal may be sold at prices less than the fixed minimum except at the risk of severe penalties. Code coal is that produced by code members, i. e., coal producers who accept membership in the code. § 5 (a). All producers of bituminous coal within the statutory districts are eligible for membership, and therefore all coal produced by any of these producers is potentially code coal. The code regulates the coal and not the producer. In order to force the eligible coal within the code, an excise tax of 19½% of the sale price is placed upon all bituminous coal "sold or otherwise disposed of by the producer thereof, which would be subject to the application of the conditions and provisions of the code," with a blanket exemption from this tax of sales or other disposal by code members.

The core of the Act is the requirement that coal be put under the code or pay the 19½ per cent excise. We said in *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381, 392, that the

sanction tax applied to non-code members. Since they were not members, it was there contended that their coal would not be subject to the code, but it was explained in the *Adkins* case that the code was intended to apply to sales "in or directly affecting interstate commerce in bituminous coal," § 4, 3rd paragraph, and that non-code coal "would be" subject to the code when it was interstate coal or coal affecting interstate commerce and therefore subject to the regulatory power of Congress. So here, the purpose of Congress, which was to stabilize the industry through price regulation, would be hampered by an interpretation that required a transfer of title, in the technical sense, to bring a producer's coal, consumed by another party within the ambit of the coal code. We find no necessity to so interpret the act. This conclusion seems to us in accord with the plain language of § 3 (a) and (b) providing for a tax on "other disposal" as well as sale. The definition of disposal as including "consumption or use by a producer, and any transfer of title by the producer other than by sale" cannot be said to put a meaning on disposal limited to the inclusion. Cf. *Federal Land Bank of St. Paul* v. *Bismarck Lumber Co., ante,* p. 95, and cases cited at 99–100. It is true that § 4–II (e) speaks of a violation of the price provisions by "sale or delivery or offer for sale of coal at a price below" the minimum, without reference to "other disposition," the phrase generally used; but the failure to include those words at that point does not, we think, justify an interpretation that coal covered by the code may be disposed of otherwise than by a transfer of title without penalty. We think the language of § 5 (b) relating to findings on orders punishing for violation of the code shows this to be true. It reads, so far as pertinent, as follows:

". . . the Commission shall specifically find . . . the quantity of coal sold or otherwise disposed of in violation of the code . . .; the sales price at the mine or the market value at the mine if disposed of otherwise than by sale at

the mine, or if sold otherwise than through an arms' length transaction, of the coal sold or otherwise disposed of by such code member in violation of the code or regulations thereunder." 50 Stat. 84.

This conclusion is fortified by an examination of the tax section of the 1935 act from which the present § 3 is obviously derived. In the first or 1935 act, captive coal was taxed along with other coal. The tax was laid upon the "sale or other disposal of all bituminous coal produced within the United States." It was "15 per centum on the sale price at the mine, or in the case of captive coal the fair market value of such coal at the mine." 49 Stat. 993, § 3. Evidently the draftsman thought of the sale of free coal and of the "other disposal" of captive coal. See further, on the question of the meaning of a sale, *In re Bush Terminal Co.*, 93 F. 2d 661, 663.

Finally, respondent contends that, if the act is construed to apply to the contractual arrangements just considered, it is beyond the power of Congress under the Commerce and Due Process Clauses of the Constitution. This is said to be so because there is no power in Congress to regulate the price paid for the service of mining coal or the consideration for mining rights, and to do so would violate the Fifth Amendment. We are, in this review by certiorari, determining only the question of whether the Seaboard is a producer under the Act. Congressional power over that problem is beyond dispute. *Currin* v. *Wallace*, 306 U. S. 1; *United States* v. *Darby*, 312 U. S. 100; *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of the case.

MR. JUSTICE ROBERTS:

I think the judgment should be affirmed. There are limits to which administrative officers and courts may ap-

propriately go in reconstructing a statute so as to accomplish aims which the legislature might have had but which the statute itself, and its legislative history, do not disclose. The present decision, it seems to me, passes that limitation.

The case involves an Act of Congress which, in implementing its declared purpose and intent, carefully delimits by inclusive and exclusive definition those who shall and those who shall not be subject to its regulatory provisions. Upon a record in which there is not a single disputed fact, the bare question is presented whether the words the Congress used bring the respondents within the Bituminous Coal Code or exclude them from its operation. In answering that question, the Director made no controverted finding of fact, exercised no judgment as to what the relevant circumstances were, but merely decided that the meaning of the statute was that the respondents' transactions required that they become members of the Code or suffer the penalty of the 19½% tax for failing to join the Code. If the Director was in error, his error was a misconstruction of the Act which created his office; and that error, under all relevant authorities, is subject to court review. It is specifically made so subject to review by the statute in question.[1]

The Bituminous Coal Act, as its preamble declares, is aimed at the regulation of prices and unfair methods of competition in the marketing of bituminous coal in interstate commerce,[2] as the means of promoting that commerce and relieving it from practices and methods which burden and obstruct it. The body of the Act is confined to the enforcement of these purposes and none other.

To accomplish the declared end, the statute adopts a comprehensive scheme for the regulation of prices and

---

[1] Section 6 (b) and (d).

[2] *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381, 388, 393.

trade practices in the marketing of bituminous coal in interstate commerce. It creates a Commission and, by § 4, directs the Commission to promulgate a Bituminous Coal Code, to which coal producers who are "code members" are made subject. By Part II of § 4, the Commission is given authority to fix minimum and maximum prices for code members in conformity to specified standards. Subdivision (i) of § 4, Part II, specifies methods of competition in the marketing of coal which are declared to be unfair and violations of the Code.

Section 3 (a) imposes a tax of 1 cent per ton on all coal "sold or otherwise disposed of by the producer" and defines disposal, for the purposes of this section alone, as including "consumption or use" by a producer and any transfer of title by a producer other than by sale. The acknowledged purpose of this subsection is the levy on all coal taken out of the ground, and used by whomsoever, of a small tax to pay the expense of the administration of the Act. The respondents admit their liability for this exaction. They have paid this tax and no question arises in respect of it.

Section 3 (b), as a means of securing compliance with the regulatory provisions of § 4, imposes a penal tax of 19½% of the sale price of the coal, or of its fair market value when disposed of otherwise than by a sale, on all the coal sold or otherwise disposed of by a producer to whom the regulatory provisions as to price and unfair methods of competition included in § 4 are applicable. Only those who are producers of coal and would be subject to the provisions of the Code are liable to the penalty tax as an alternative to joining the Code and thus coming within the regulatory provisions applicable to such Code members. Such regulatory provisions are concerned only with those who sell or market coal.

Subdivision (1) of Part II of § 4 declares: "The provisions of this section shall not apply to coal consumed by the

producer or to coal transported by the producer to himself for consumption by him." The respondents insist that this subsection plainly exempts them from becoming members of the Code and that, in pursuance of the subsection, the Director should have granted their application for exemption.

Some stress is laid by the petitioners on § 17 (c) which declares that:

"As used in this Act,

. . . . .

"(c) The term 'producer' includes all individuals, firms, associations, corporations, trustees, and receivers engaged in the business of mining coal."

It seems plain enough that this provision was not intended to nullify subsection (1) of § 4, Part II. The evident purpose was to make it clear that, under whatever form the business was done, the operator should come under the applicable provisions of the statute. This subsection has no relevance to the question presented in this case.

The term "producer" is not a technical term or a term of art, but the statute has not left the Director or the courts without guides respecting the meaning of the word as used in the statute. It is the Director's duty to observe those guides in applying the statute and, if he fails so to do, it is the obligation of the courts to observe them in performing their statutory duty to review his determination. The context, the purpose of the Act, and the means adopted to carry them into effect, make clear the meaning of the word "producer" as used in the statute. This court obviously fails in performing its duty and abdicates its function as a court of review if it accepts, as the opinion seems to do, the Director's definition of "producer" and then proceeds to accommodate the meaning of related provisions to the predetermined definition. So to do is a

complete reversal of the normal and usual method of construing a statute.

The legislative history [3] demonstrates, and the opinion of the court concedes, that the purpose of § 4 (Pt. II (1)) was to exclude from the provisions of the Act regulating prices and other matters of competition in interstate marketing, coal produced from "captive mines"; that is, coal produced by the owner of a mine and consumed by him without placing it on the market. It is, as it must be, also conceded that subdivision (1) excludes from the operation of the Act one who mines coal by his own employes, upon land owned or leased by him, and consumes it in his business or industry. The only possible differentiation between the respondents' method of conducting the business and that of the usual captive mine lies in the fact that the respondents' coal is mined by an independent contractor instead of by employes. That circumstance, however, will not justify the statement that respondents do not produce the coal, any more than it would justify the statement that they would not transport coal to themselves, within the meaning of the Act, if they shipped it by a common carrier who was an independent contractor. The circumstance that the coal is mined by a contractor instead of an employe, or transported by a common carrier, cannot have any more, or any different, effect upon the subjects of regulation—prices and unfair methods of competition—in the one case than in the other. In both cases, the owner would consume coal which would otherwise come on the market. In neither case would the coal be brought into competition with marketed coal. In each case, the owner would remain free to buy coal on the market whenever the market price fell below the cost of production at his own mine.

---

[3] Hearings before the Committee on Interstate Commerce of the Senate, 2d Sess., 74th Cong., on S. 4668, pp. 32, 33.

Subdivision (1) cannot appropriately be construed to deny respondents the right to be excluded from the operation of the Act upon their application as provided in § 4–A when there are plainly no affirmative provisions of the Act subjecting them to its regulation. It will hardly be denied that, by respondents' total operation, coal is produced. If they are not the producers, because they pay a contract price instead of wages for its production, they are not subject to the 19½% tax which applies only to producers; and they are thus exempt from the only sanction which would compel them to become Code members subject to the regulatory provisions of the Act. Since they market no coal, the provisions of § 4 relating to prices and methods of competition in the marketing of coal are not applicable to them. On the other hand, if the independent contractor whom respondents employ to mine the coal is deemed the producer of the coal, he likewise is exempt from the regulatory provisions and also exempt from the 19½% penal tax. For, even if he be called a producer, he neither markets nor sells the coal and he cannot be said to dispose of coal which he does not own. Disposal must mean something more than physical production, delivery, or transportation of the coal of another. If it were otherwise, the superintendent of a captive mine would be subject to the tax because he is engaged in mining coal and delivering it to the owner who consumes it. It is well known that, in many coal fields, coal is gotten out by employing a miner who in turn employs his own gang to assist him in the mine. If the Director's position is correct, this method of operation would subject the owner and operator of a captive mine to regulation under the Act. That view would be plainly untenable.

The vice in the construction which the court now adopts, apparently only because the Director has adopted it, lies in the fact that this construction is of practical significance

only as it is preliminary to regulation of features of the coal industry other than prices and methods of competition in the marketing of coal. Congress has not seen fit to prescribe such regulation. It is clear that the attempted subjection of respondents to the control of the Commission is without congressional authority.

The CHIEF JUSTICE and MR. JUSTICE BYRNES join in this opinion.