**UNITED STATES LINES CO. v. CIVIL AERONAUTICS BOARD.**

No. 146, Docket 20856.

Circuit Court of Appeals, Second Circuit.

Jan. 27, 1948.

Kirlin Campbell Hickox & Keating, of New York City (Cletus Keating, Edwin S. Murphy, David Dawson and Helen C. Cunningham, all of New York City, of counsel), for petitioner.

Edward J. Hickey, Jr., Sp. Asst. to Atty. Gen., and H. Don Reynolds, Chief, Enforcement and Litigation Section, Civil Aeronautics Board, and O. D. Ozment and James L. Highsaw, Jr., Attys., Civil Aeronautics Board, all of Washington, D. C. (John F. Sonnett, Asst. Atty. Gen., Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, of Washington, D. C., and John F. X. McGohey, U. S. Atty., and David McKibbin, Asst. U. S. Atty., both of New York City, of counsel), for respondents.

Cleary, Gottlieb, Friendly & Cox, of New York City, (Henry J. Friendly, of New York City, of counsel), for Pan American Airways, Inc., intervenor.

Before AUGUSTUS N. HAND, CLARK and MAGRUDER, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a petition to review the two orders of the Civil Aeronautics Board above referred to. While the orders sought to be reviewed may seriously affect the business interests of the United States Lines and, therefore, are most important to that company they were clearly within the jurisdiction of the Board, were supported by substantial evidence, and may be affirmed with little discussion.

The proceeding relates to an agreement between Pan American Airways, Inc., and the United States Lines providing for general agency representation of Pan American by United States Lines in Europe and the British Isles and for other services by United States Lines. The agreement was filed with the Aeronautics Board on September 30, 1938, pursuant to Section 412(a) of the Civil Aeronautics Act, but consideration was deferred during the war because United States Lines was then operating steamships only as agent for the government. On September 11, 1945, Pan American informed the Board that the agreement was still in operation. The Board replied to Pan American by letter of August 8, 1946, stating that upon the facts then available it was unable to find that the agreement was not adverse to the public interest but would give the parties the opportunity to request a hearing before taking final action. By petition of September 5, 1946, United States Lines requested a hearing on the questions (1) whether or not the Board had jurisdiction of the agreement, and (2) whether the agreement should be continued in effect.

The agreement contains provisions under which the United States Lines is to provide various services in Pan American's Transatlantic operations. Among these provisions "Pan American appoints U. S. Lines, its subsidiaries and agents, as exclusive general traffic agents for Pan American in Great Britain, France, Denmark, Belgium, Latvia, Lithuania, Norway, Sweden, Finland, Russia, Poland, Romania, Portugal (excluding the Azores and other islands),

Czechoslovakia, Switzerland, Bulgaria, Austria, Irish Free State, Germany, Holland, and Estonia. Provision is also made that other European countries may be added from time to time by Pan American."

The agreement further provides that United States Lines furnish Pan American meteorological data and information with respect to harbors, airports, terminal facilities and clearance of customs, and immigration procedure in Europe; that the parties will cooperate in the establishment of round trip air-water tariffs for the transportation of passengers and baggage between the United States and Europe; and also provides for the handling of Pan American passengers and baggage in Europe by United States Lines.

Under the agreement United States Lines receives commissions for its general agency service and Pan American guarantees a minimum monthly compensation to its agent.

■ The provisions of Section 412(a) and (b) of the Civil Aeronautics Act[1] clearly require the holding of the Board that the agreement was subject to its jurisdiction. This seems to us to follow from the express language of the statute. It is surely an agreement between an air carrier —Pan American—and another carrier— United States Lines; it relates to the establishment of "transportation rates, fares, charges," and provides "for other cooperative working arrangements." The contention that such a contract involving the solicitation and sale of tickets, the handling of excess baggage for air passengers, and the assistance in clearance of customs for air passengers in and out of Europe does not affect air transportation, is contrary to the findings of the examiner and of the Board and utterly lacks foundation. Agencies of a railroad having similar functions have been held to "affect" interstate commerce. McCall v. California, 136 U.S. 104, 10 S.Ct. 881, 34 L.Ed. 392; Norfolk &c R. Co. v. Pennsylvania, 136 U.S. 114, 120, 10 S.Ct. 958, 34 L.Ed. 394; DiSanto v. Pennsylvania, 273 U.S. 34, 47 S.Ct. 267, 71 L.Ed. 524.

■ The contention is made by United States Lines that §§ 408(c) and 409 [49 U.S.C.A. §§ 488(c) and 489] necessarily exclude from § 412 [49 U.S.C.A. § 492] agreements relating to ground or auxiliary services in the nature of the solicitation and sale of tickets, carrying excess baggage and the like. Section 408(c)[2] had for its primary purpose authorization of an air

---

[1] § 412, 49 U.S.C.A. § 492(a, b).

"(a) Every air carrier shall file with the Board a true copy, or, if oral, a true and complete memorandum, of every contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise) affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancellation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements.

"(b) The Authority shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this chapter, and shall by order approve any such contract or agreement, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this chapter; except that the Authority may not approve any contract or agreement between an air carrier not directly engaged in the operation of aircraft in air transportation and a common carrier subject to chapters 1, 8, 12, and 13 of this title, governing the compensation to be received by such common carrier for transportation services performed by it."

[2] § 408 "(c) The provisions of this section and section 409 shall not apply with respect to the acquisition or holding by any air carrier, or any officer or director thereof, of (1) any interest in any ticket office, landing area, hangar, or other ground facility reasonably incidental to the performance by such air carrier of any of its services, or (2) any stock or other interest or any office or directorship in any person whose principal business is the maintenance or operation of any such ticket office, landing area, hangar, or other ground facility."

carrier to continue existing ground and terminal facilities through separate non-carrier agencies which, under §§ 408 and 409, would otherwise be unlawful without prior administrative approval. We see no reason to suppose that § 408(c) was intended to exclude all agency agreements between an air carrier and another carrier from the exercise of the Board's jurisdiction under § 412.

By our order of January 5, 1948, Pan American Airways, Inc., was allowed to intervene. The affidavit of its vice-president, J. H. Smith, sets forth that the finding of the Board in the present proceeding rested on the ground that it was not in the public interest that a transatlantic air carrier should place exclusive reliance for sales representation in most of the nations of Europe on a company engaged in a rival form of transportation, rather than upon the ground that the agreement was not working well or that the air carrier had not obtained adequate representation at substantial economies. The affidavit also says that because the decision of the Board was based upon the broad ground that the agreement made it dependent for its European business on an agent engaged in what was or might become a rival business, evidence showing a large increase of Pan American's earnings in the last half of 1947 sought to be introduced on a rehearing would not affect the result. The affidavit further recites that Pan American has already made arrangements for new agents in place of the United States Lines and would be subjected to double expenses if there should be delay in carrying out the termination of the existing lease.

Whether in the end the continuance of the present agency (which in any event could be terminated on a year's notice), or the setting up by Pan American of new agencies of its own, is in the public interest, is a disputed question dependent upon such a forecast of the future as the Board is entitled to make. Likewise, whether the United States Lines, which is in a competitive position, is the most desirable agent for Pan American—when the agency covers most of Europe and would thus affect an enormous percentage of Pan American's business if that agent should fail in diligence or loyalty—is also plainly a question for the Board. While it is not suggested that failure in either respect is likely, we think there can be no doubt that the decision whether to retain an agent exercising such a wide authority and subject to possible temptation to be more diligent on its own behalf than for the benefit of Pan American is a matter for decision of the Board and not of the courts.

It is to be remembered that the decision by the Board is the result of the only hearing had under § 412 of the Civil Aeronautics Act as to the validity of the agreement. That decision promulgated a policy already foreshadowed by the ruling in Pan American-Matson-Inter-Island Contract, 3 C.A.B. 540, and in view of the business and relations of United States Lines and Pan American was within the jurisdiction of the Board. It may not be disturbed by this court in the absence of any showing of an arbitrary exercise of discretion. Securities Comm. v. Chenery Corporation, 332 U.S. 194, 207, 208, 67 S.Ct. 1575; Gray v. Powell, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301.

The denial by the Board of the petition of United States Lines for a rehearing and the reception of additional evidence was made and seems to have been justified on the merits but the denial occurred subsequent to December 18, 1947, when the petition to review the order disapproving the agency agreement took effect and after this court had acquired exclusive jurisdiction to affirm, modify or set aside the orders appealed from pursuant to § 1006(d) of the Civil Aeronautics Act. The strictly canonical procedure might have been for any party so desiring to pray this court for an order for the return of the record to the Board so that it might further consider the petition for a rehearing but, as this has neither been asked for nor would seem to have any real merit, we think that the orders of the Board herein sought to be reviewed should be affirmed.

Orders affirmed and petition to review dismissed.