**SOUTHWESTERN ELECTRIC POWER COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**ALABAMA POWER COMPANY et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**ARIZONA PUBLIC SERVICE COM-PANY et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

Nos. 18667, 18689, 18672.

United States Court of Appeals Fifth Circuit.

May 16, 1962.

Rehearing Denied June 29, 1962.

No. 18667:

Richard L. Arnold, Texarkana, Ark., for petitioner.

Howard E. Wahrenbrock, Sol., Drexel D. Journey, Atty., John C. Mason, Gen. Counsel, F. P. C., Washington, D. C., for respondent.

Nos. 18669 and 18672:

A. J. G. Priest, Charlottesville, Va., and Reid & Priest, by Peyton G. Bowman III, Washington, D. C., for all the petitioning companies.

Alvin W. Vogtle, Jr., Joseph M. Farley, Martin, Vogtle, Balch & Bingham, Birmingham, Ala., and Hayden N. Smith, Edwin J. Wesely, Winthrop, Stimson, Putnam & Roberts, New York City, for Alabama Power Co.

Frank Snell, Snell & Wilmer, Phoenix, Ariz., for Arizona Public Service Co.

Daniel James, Cahill, Gordon, Reindel & Ohl, New York City, for Arkansas Power & Light Co.

John W. Kelly, Treasurer, for Blackstone Valley Gas & Electric Co.

Joseph P. Tyrrell, Boston, Mass., for Boston Edison Co.

Shearon Harris, Raleigh, N. C., for Carolina Power & Light Co.

M. S. Lockhart, Gould & Wilkie, New York City, for Central Hudson Gas & Electric Corp.

A. T. Gardner, Vice President and Secretary, and Joseph H. Geoghegan, Berl, Potter & Anderson, Wilmington, Del., for Delaware Power & Light Co.

Henry G. Wasson, Jr., Pittsburgh, Pa., for Duquesne Light Co.

Richard K. McPherson, Joplin, Mo., for Empire District Electric Co.

William R. Cook, Johnson, Clapp, Ives & King, Boston, Mass., for Fitchburg Gas & Electric Light Co.

William H. Schroder, Tench C. Coxe, Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., and Hayden N. Smith, Edwin J. Wesely, Winthrop, Stimson, Putnam & Roberts, New York City, for Georgia Power Co.

Bert Lane, Yonge, Beggs & Lane, Pensacola, Fla., and Hayden N. Smith, Edwin J. Wesely, Winthrop, Stimson, Putnam & Roberts, New York City, for Gulf Power Co.

Major T. Bell, Orgain, Bell & Tucker, Beamont, Tex., for Gulf States Utilities Co.

Olcott D. Smith, Day, Berry & Howard, Hartford, Conn., for Hartford Electric Light Co.

Robert E. Barrett, Jr., President, for Holyoke Water Power Co.

A. C. Inman, Boise, Idaho, for Idaho Power Co.

Stanley Garrity, Wichita, Kan., for Kansas Gas & Electric Co.

J. Raburn Monroe, Monroe & Lemann, New Orleans, La., and Daniel James, Cahill, Gordon, Reindel & Ohl, New York City for Louisiana Power & Light Co.

Charles B. Finch, New York City, for Marietta Electric Co., Monongahela Power Co., Monterey Utilities Corp., Northern Virginia Power Co., Potomac Edison Co., Potomac Light & Power Co., South Penn Power Co., The West Maryland Power Co. and West Penn Power Co.

Richard B. Dunn, Boston, Mass., for Merrimack-Essex Electric Co., Narragansett Electric Co., Suburban Electric Co. and Massachusetts Electric Co.

M. L. Hibbard, Chairman, Duluth, Minn., for Minnesota Power & Light Co.

James S. Eaton, Eaton, Cottrell & Galloway, Gulfport, Miss., and Hayden N. Smith, Edwin J. Wesely, Winthrop, Stimson, Putnam & Roberts, New York City, for Mississippi Power Co.

Garner W. Green, Green, Green & Cheney, Jackson, Miss., and Daniel James, Cahill, Gordon, Reindel & Ohl, New York City, for Mississippi Power & Light Co.

John A. Woodbridge, St. Louis, Mo., for Missouri Edison Co., Missouri Power & Light Co. and Union Electric Co. of Missouri.

Sam B. Chase, Jr., Butte, Mont., for Montana Power Co.

Floyd W. Lewis, New Orleans, La. and Daniel James, Cahill, Gordon, Reindel & Ohl, New York City, for New Orleans Public Service, Inc.

Bradford S. Magill, Naylon, Foster, Dean & Aronson, New York City, for New York State Electric & Gas Corp.

Donald E. Nelson, A. R. Renquist, Minneapolis, Minn., for Northern States Power Co., a Minnesota corporation, and Northern States Power Co., a Wisconsin corporation.

D. Bruce Mansfield, Akron, Ohio, for Ohio Edison Co. and Pennsylvania Power Co.

Cameron F. MacRae, LeBoeuf, Lamb & Leiby, New York City, for Orange & Rockland Utilities, Inc. and Rockland Electric Co.

Richard H. Peterson, Malcolm MacKillop, San Francisco, Cal., for Pacific Gas & Electric Co.

Hugh Smith, Smith, Gray, Hill & Rodgers, Portland, Or., for Pacific Power & Light Co.

Austin Gavin, Allentown, Pa., for Pennsylvania Power & Light Co.

Vincent P. McDevitt, Eugene J. Bradley, Philadelphia, Pa., for Philadelphia Electric Co.

Cornelius Means, Washington, D. C., for Potomac Electric Power Co.

Paul G. Jasper, Plainfield, Ind., for Public Service Co. of Indiana, Inc.

Wendell W. Black, Holman, Mickelwait, Marion, Black & Perkins, Seattle, Wash., for Puget Sound Power & Light Co.

Prescott R. Andrews, Humes, Smith & Andrews, New York City, for Southwestern Public Service Co.

L. A. Nichols, President, for Superior Water, Light & Power Co.

F. Gerald Irvine, Salt Lake City, Utah, for Utah Power & Light Co.

John W. Riely, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for Virginia Electric & Power Co.

Alan P. O'Kelly, Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., for Washington Water Power Co.

David R. Pokross, Peabody, Brown, Rowley & Storey, Boston, Mass., for Western Massachusetts Electric Co.

Ralph D. Stevenson, Stevenson, Dendtler, Bailey & McCabe, Chicago, Ill., for Central Illinois Public Service Co. and West Texas Utilities Co.

Howard E. Wahrenbrock, Sol., Drexel D. Journey, Atty., John C. Mason, Gen. Counsel, Washington, D. C., Leonard D. Eesley, Asst. Gen. Counsel, Watt N. Martin, Atty., F. P. C., Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and POPE * and GEWIN, Circuit Judges.

POPE, Circuit Judge.

This matter is before us upon petitions of some 63 companies engaged in the business of selling and distributing electric power, seeking review of a certain order of the Federal Power Commission issued August 17, 1960.

The order in question required the respondents before the Commission, including the petitioners here, to reclassify a portion of the expenditures made by them for certain advertisements by placing them in an accounting classification specified by the Commission. Orders denying petitions for rehearing were issued October 11, 1960, after which these petitions were filed in conformity with §

313(b) of the Federal Power Act (16 U.S.C.A. § 825l(b)).[1]

Beginning late in 1956, continuing through 1957, to early 1958, these Electric Power companies were participating in an "Electric Companies Advertising Program" (ECAP) in behalf of "America's independent electric light and power companies." The eight advertisements here involved,[2] most of them illustrated, are similar in that they develop this theme: a substantial portion of the sums paid for electricity by customers of private electric light and power companies goes for taxes; people who get their electricity from federal government electric systems have included in their bills either nothing for taxes or else only a very small amount, since, generally speaking, the government systems are not taxed; you who use private power pay taxes used to help build the federal plants; in effect you are helping to pay the electric bills of those who buy the public power; this is unfair tax favoritism. The advertisements then conclude with inquiries, varying from "Don't you think something ought to be done about this unfair tax favoritism?" to "Don't you think this unfair tax favoritism needs thorough study and discussion?" A sample of these advertisements is described in the margin.[3] They appeared,

* From the Ninth Circuit, sitting by designation.

1. The petitions also invoke the provisions for review of § 10 of the Administrative Procedure Act (5 U.S.C.A. § 1009).

2. The initial Order to Show Cause described nine advertisements, Nos. 1 to 9, inclusive. The final order required reclassification of the expenditures for eight only, Nos. 2 to 9.

3. "WHY DO CUSTOMERS OF *THIS* POWER DAM * * *
(Here appears a picture of a power dam below which is inscribed: "This power dam was built on the Susquehanna River near the Pennsylvania-Maryland border by the local independent electric light and power company at no cost to taxpayers.") HAVE TO HELP PAY ELECTRIC BILLS FOR CUSTOMERS OF *THIS* ONE?"

(Here appears a picture of another dam, beneath which appears: "This TVA dam was built on the Tennessee River near Paducah, Kentucky, by the federal government with millions of dollars that you and other citizens paid in taxes.")
"Your taxes help *build* federal government power plants like the one in the lower picture. And these plants *keep* on costing. you money year after year. Here's how: About 23¢ of every dollar you pay for electricity from our independent electric light and power company goes for taxes. But because of present tax laws, customers of federal power systems escape paying most of the taxes in *their* electric bills that you pay in *yours*. They pay taxes of only about 4¢ per dollar if their power comes from the federal government's TVA power system, for example. So to make up for the lost tax revenues which federal power projects *don't* pay, you have to be taxed more.

during the period mentioned, in various weekly and monthly magazines such as Life, Look, Colliers, The Saturday Evening Post, Atlantic, Saturday Review of Literature, and a few others.

On August 1, 1958, the Commission issued an order setting forth the amounts which each of the seventy-six electric power companies named therein had contributed to the ECAP advertising program for 1957, and disclosing how these sums had been classified by the companies, under the Commission's Uniform System of Accounts.[4] The order fixed a time and place for hearing, at which each of the companies was ordered to show cause why a stated portion of such expenditures should not be reclassified to Account No. 538—"Miscellaneous Income Deductions".[5]

This Uniform System of Accounts was prescribed by the Commission for all licensees[6] and public utilities[7] subject to the provisions of the Federal Power Act (49 Stat. 838). The establishment of such system is authorized by § 301(a) of Part III of the Act (16 U.S.C.A. § 825

(a) which provides that the Commission "may prescribe a system of accounts to be kept by licensees and public utilities and may classify such licensees and public utilities and prescribe a system of accounts for each class." The entire subsection is set forth in the margin.[8]

The proceeding initiated by the Order to Show Cause, and under review here, was undertaken pursuant to that part of this same section which provides: "The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof."

The Order to Show Cause stated the ground on which the accounting entries in Accounts Nos. 787 and 801 were questioned by the Commission as follows: "The staff recommends the reclassifica-

---

Is it fair for you to have to pay extra taxes like this for customers of federal government power systems? Shouldn't something be done about it? America's Independent Electric Light and Power Companies."

4. Some had entered these items under account No. 787, "Demonstration, Advertising, and Other Sales Expenses", and some under account No. 801, "Miscellaneous General Expenses".

5. This order described nine advertisements including the eight previously mentioned. The sum sought to be reclassified was that part of the ECAP total expenditures represented by the nine ads described.

6. That is, persons licensed under § 4 of Part I of the Act. (16 U.S.C.A. § 797).

7. That is, electric utility companies engaged in interstate commerce, as defined in § 201 of Part II of the Act. (16 U.S. C.A. § 824)

8. "§ 301.(a) Every licensee and public utility shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by

rules and regulations prescribe as necessary or appropriate for purposes of the administration of this Act, including accounts, records, and memoranda of the generation, transmission, distribution, delivery, or sale of electric energy, the furnishing of services or facilities in connection therewith, and receipts and expenditures with respect to any of the foregoing: *Provided, however,* That nothing in this Act shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by licensees and public utilities and may classify such licensees and public utilities and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof."

tion of the amounts [expended for the nine advertisements referred to in footnote 5, supra] to Account No. 538, Miscellaneous Income Deductions, for the reason that the expenditures involved relate to the matter of private versus public ownership of electric facilities, a subject of political controversy, and the above-listed copy is of an argumentative character or nature in that controversy. * * * By separate letters of the Commission dated February 27, 1958, each of the above Companies was advised that in the opinion of this Commission expenditures involving the presentation of argument in matters of political controversy are not properly includible in any of the 700 or 800 Series of Accounts of the Commission's Uniform System of Accounts but rather should be classified in Account No. 538." [9]

It is to be noted that such a change of classification would be to mark these expenditures as deductions from income rather than as charges to operating expenses.

At the outset of the hearing before an examiner the respondent companies produced a large number of witnesses through whose testimony they sought to adduce proof that the classification of these expenditures in either Account 787 or 801, as operating expenses, was prop-

er. The evidence thus offered was described in the Commission's opinion as follows: "In summary, this evidence was intended to show that the questioned advertising expenditures were necessary to counter the competition of government owned and subsidized electric power facilities and to protect respondents' businesses from such competition; that therefore such expenditures were ordinary, necessary, and just and reasonable expenses in the operation of the respondents' businesses; and that accordingly, within the meaning and intent of our System of Accounts, they should be classified to either or both Accounts 787 and 801, as proper operating expenses."

The witnesses produced, 37 in number, made up an impressive list of business executives, accountants and auditors, deans and professors of schools of business administration, public utility financial advisors and security analysts, and presidents of electric power companies. In every case, after the witness had stated his qualifications, objections were sustained to his further testimony; but in each case the witness submitted his testimony through a sworn offer of proof, and all of this is contained in the record.

The examiner's exclusion of this evidence was appealed to the Commission,

9. In the Commission's System of Accounts, under No. 787, subdivision "787.2 *Advertising*" appears the following: "This account shall include the cost of labor and materials used and expenses incurred in connection with advertising for the purpose of promoting the sales of electricity. * * * ITEMS 1. Advertising in newspapers, periodicals, etc. 2. Advertising manager and assistants. 3. Clerks. 4. Materials and expenses in preparing: (a) Advertisements. (b) Booklets. (c) Bulletins. (d) Dodgers. (e) Posters. 5. *Stenographers and typists.*"

Account No. 801 is described as follows: "Miscellaneous General Expense. This account shall include such items of expense applicable to the electric department as the cost of publishing and distributing annual reports to stockholders; advertising notice of stockholders' meetings; dividend and other corporate and financial notices of a general character; associa-

tion dues; contributions for conventions and meetings of the industry; cost of research and experimental work conducted for the benefit of the electric department or the industry or for the improvement of electric service (except such amounts as may be properly chargeable to other accounts); fees of transfer agents, registrars of stock, and fiscal agents; director's fees; and any other miscellaneous expenses connected with the general management and not otherwise provided for."

Account 538 is described as follows: "538. Miscellaneous Income Deductions. This account shall include miscellaneous debits to income, not provided for elsewhere. ITEMS 1. Decline in value of investments. (See Balance sheet instruction 4.) 2. Donations. 3. Expenditures for associated companies for which the utility will not be reimbursed."

which upheld the examiner's ruling. Petitioners here assert that this proffered evidence should have been received; that it would demonstrate that these expenditures were ordinary, necessary, just and reasonable in the operation of the companies' businesses and intended to promote the sale of electricity, and enhance the companies' credit standing. They further contend that the opinion testimony of the accountant witnesses demonstrates that their entries of these expenditures in Accounts 787 or 801 was in line with sound and standard accounting procedures.[10]

In its ruling as to the admissibility of this evidence, both on appeal respecting the evidence question, and in its final order, the Commission held that the one issue in the proceeding was "whether respondents' questioned advertising expenditures were political"; that "only evidence relevant to [that] issue * * * should be admitted in evidence"; that the evidence proffered was "without probative value to show the contrary", that it was "not relevant to the issue of whether the advertisements were political, but was directed to other subsidiary issues, such as whether the advertisements were ordinary and necessary operating expenses"; that "assuming the relevancy of this proffered evidence it

was lacking in sufficient weight to prove that the advertisements were in fact non-political."[11]

At this point we should consider the petitioners' initial contention that the Commission's own rules and regulations required it to receive this proffered evidence and receiving it to conclude that the expenditures here in issue were not such as to be properly included in Account 538. This contention is based upon the language of paragraph 2F of the Commission's general instruction relating to its uniform system of accounts which reads as follows: "F. All charges to the accounts prescribed in this system for electric plant, income, operating revenues, and operating expenses shall be just and reasonable, and any payments by the utility in excess of just and reasonable charges shall be included in Account 538, Miscellaneous Income Deductions." Petitioners say that the only charges included in Account 538 are those payments by the utility in excess of just and reasonable charges; that their offered evidence established conclusively that the payments for the advertising here in question were just and reasonable and that therefore they were not "in excess of just and reasonable charges", and hence that they should not be included in Account 538.

10. In general, the tendered evidence was to the effect that these companies had been and were confronted with widespread and vigorous competition from agencies interested in the promotion of the sale of government power, characterized by a disparaging of investor-owned power and an extolling of the virtues of public power; that the government's installed power capacity had grown from less than one percent of all electric utilities in 1933 to 17.3 per cent in 1958, when the government had become the nation's largest single producer, that the government competition was damaging because its operation enjoyed exemption from the payments which the companies were required to pay, so that this tax-free power could sell for 30% to 40% less than tax-paying privately-financed power. These witnesses would testify that these advertisements were necessary and proper to meet this competition; and that when

their customers had this tax discrimination explained to them, they were likely to be favorably impressed with the companies' story and more inclined to stay with them.

11. Notwithstanding this ruling, the Commission did take note of some of the testimony, as contained in the offers of proof which were under oath. Its opinion recites: "As to the relatively small amount of opinion testimony sought to be adduced by respondents that the advertisements were 'non-political,' we have considered with care this evidence, which is in the record before us. And we have concluded that, in view of the self-evident facts attested by the advertisements themselves, this evidence too, even when to it is added all the other evidence proffered by the respondents, is of insufficient weight to establish that the advertisements are in fact non-political in character."

This argument is based upon the assumption that Instruction No. 2F must be read to mean that the *only* items to be included in that account are expenses in excess of just and reasonable charges.[12]

We cannot agree that these are the only charges properly assigned to Account 538. All that can be said is that such charges are, under paragraph 2F, properly placed in that account.[13] The regulations themselves appear to contemplate the probability that new questions of proper classification of expenditures will arise from time to time, for General Instruction No. 4 provides for the submission of such questions to the Commission for consideration and decision.[14]

▮ When we read the provisions of § 301(a), footnote 8, supra, we note that the Commission is authorized to exercise its authority to prescribe a system of accounts "as necessary or appropriate for purposes of the administration of this Act." That is the sole guide and the only limitation upon the very broadly stated authority of the Commission to prescribe such a system and to determine by order the accounts in which particular outlays shall be entered or charged.

It may be noted that this language authorizing the Commission to take action "as necessary or appropriate for purposes of the administration of this Act" appears to confer upon the Commission a broad power to make administrative determinations of policy. This language

has some resemblance to the language construed by the Supreme Court in S. E. C. v. Central-Illinois Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, where the Court was considering to what extent a court had power to review or alter a plan for dissolution submitted under the Public Utility Holding Company Act of 1935 and approved by the Securities and Exchange Commission. There the Commission was authorized to approve such a plan if, after notice and opportunity for hearing, it "shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan." 15 U.S. C.A. § 79k(e). Significant in that case was the broad scope of the quoted words: "Necessary to effectuate the provisions of subsection (b)". In our case we have similarly broad phraseology, also indicating a grant of policy making power, namely, "as necessary or appropriate for purposes of the administration of this Act."

That language, read in the light of the decision in the Central-Illinois case, supra, suggests a rather strict limitation upon our power to upset the Commission's action. "Administrative determinations of policy, often based upon undisputed basic facts, in an area in which Congress has given the agency authority to develop rules based upon its expert knowledge and experience, are exemplified by Securities and Exchange Commis-

---

12. The brief of petitioners in Nos. 18669 and 18672 states: "Expenditures having their basis in operations are includible in these 'below-the-line' accounts only when and if they cease to be 'operating expenses' because they are 'in excess of just and reasonable charges', as provided in General Instruction 2.F."

13. As disclosed by the description of account No. 538, contained in the Commission's regulations setting up its uniform system of accounts, (see footnote 9, supra), other items are there listed as appropriately belonging under account No. 538; and General Instruction No. 5 recites: "Lists of 'items' appearing in the texts of accounts or elsewhere herein are for the purpose of more clearly indicat-

ing the application of the prescribed accounting. The lists are intended to be representative but not exhaustive." Such a statement is obviously essential in the setting up of a complete set of accounts, for in the course of administration of an Act of this kind, over a period of years, it is inevitable that from time to time the Commission would be confronted with new situations arising out of expenditures not previously considered by the Commission for which some appropriate place must be assigned.

14. "4. Submission of Questions: To maintain uniformity of accounting, utilities shall submit questions of doubtful interpretation to the Commission for consideration and decision."

sion v. Chenery Corp., supra, in which the Commission determined that preferred stock purchased by management in the over-the-counter market during the formulation of a holding company reorganization plan could not be exchanged for common stock participation in the reorganized company, as could other preferred stock; instead management was to be paid cost plus interest for the preferred stock so purchased. The Commission's determination was made in the exercise of its duty to determine that a plan is 'fair and equitable' within the meaning of § 11(e) and that it is not 'detrimental to the public interest or the interest of investors or consumers' within the meaning of § 7(d) (6) and § 7(e). On certiorari to the Court of Appeals which had reviewed the Commission's order under § 24(a) of the Act, we held that the Commission's action was 'an allowable judgment which we cannot disturb.' 332 U.S. 194, at 209 [67 S.Ct. 1583]. This holding was based * * * upon the ground that the Commission's determination was made in an area in which Congress had delegated policy decisions of this sort to the Commission, and therefore that the agency determination was 'consistent with the authority granted by Congress.'" (338 U.S. at 127, 69 S.Ct. at 1393)

This suggestion that the language of § 301(a), which authorized the Commission in prescribing a system of accounts to do so "as necessary or appropriate for purposes of the administration of this Act" was intended to confer a measure of administrative policy making upon the Commission, is to an extent reinforced by other sections of the same Act. Thus in § 311 of the Federal Power Act (16 U.S.C.A. § 825j) it is provided that the Commission is authorized to conduct investigations "regarding the generation, transmission, distribution, and sale of electric energy, however produced * * whether or not otherwise subject to the jurisdiction of the Commission," and to do this in order "to secure information necessary or appropriate as a basis for recommending legislation." [15]

In the process of inquiring whether the Commission may appropriately require expenditures for advertisements such as these which the Commission described as "argument in matters of political controversy", to be separately and specially listed in the Uniform System of Accounts, we may well consider whether such special treatment of such expenditures would not be an appropriate way in which to assemble information as a basis for a possible recommendation for legislation upon this subject. An authority to recommend legislation seems to be a grant of power to inquire into almost any subject related to the accounting practices of electric utilities.

Another section of the Act which is relevant in determining what may be "necessary or appropriate for purposes of the administration of this Act", is § 209(c)

---

15. "§ 311. In order to secure information necessary or appropriate as a basis for recommending legislation, the Commission is authorized and directed to conduct investigations regarding the generation, transmission, distribution, and sale of electric energy, however produced, throughout the United States and its possessions, whether or not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality of the United States, or of any State or municipality or other political subdivision of a State. It shall, so far as practicable, secure and keep current information regarding the ownership, operation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section."

(16 U.S.C.A. § 824h(c)), which recites that "The Commission shall make available to the several State Commissions such information and reports as may be of assistance in State regulation of public utilities." As we shall note hereafter, there is a sharp difference of opinion between the petitioners and the Commission as to the extent to which the order herein reviewed is a rate regulation.[16] However, the language just quoted from § 209(c) would appear to have reference to contemplated rate hearings before State commissions.

The legislative history of the Federal Power Act, to which we shall have occasion to refer hereafter, contains references to some examples of large expenditures by electric power companies designed to resist enactment of legislation opposed by those companies. For instance, reference was made to large sums expended by one of the petitioners here to defeat certain legislation pending in the State of Washington. While no issue is raised in this case as to whether any of the expenditures by ECAP for advertisements were excessive in amounts, the Commission could well consider it advisable or appropriate to see to it that the accounts were set up in such manner that the State commissions could readily ascertain just how much had been expended upon political activities or advertising in relation thereto. This would seem to suggest a general authority in the Commission to require such expenditures to be specially listed and accounted for so as to be readily identified in connection with a state or other rate proceeding. It could well be argued that such information would "be of assistance in State regulation of public utilities."

Section 205(c) (16 U.S.C.A. § 824d (c)), requires every public utility (as defined in the Act) to file with the Commission schedules of rates and charges "and the classifications, practices, and regulations affecting such rates and charges". Also, § 206(b) (16 U.S.C.A. § 824e(b)), provides that the Commission "may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy." If the Commission may inquire into "practices * * * affecting such rates and charges", and investigate "the cost of production", it would appear that a requirement of special classification in the accounts of expenditures related to matters of political controversy would be in order, and appropriate for these purposes.[17]

If we then conclude that the Commission was authorized by the Act to make special provision for the classification under its uniform system of accounts of expenditures, such as those for these advertisements, the next inquiry to be made is whether it was within the power or authority of the Commission, through the order here in question, to require such expenditures to be placed in Account No. 538 under the heading of "Income Deductions."

16. The opinion which accompanied the Commission's order here, recited: "Of course, the question of whether the rate payer or the shareholder shall ultimately pay these particular expenses must await rate proceedings under the Act, for an accounting classification matter of this kind does not involve determining the just and reasonable rates for the utility."

Petitioners' brief, previously referred to, states: "We submit that any distinction between this so-called accounting reclassification proceeding and a rate case, in so far as the expenditures under review are concerned, is chimerical."

17. Other sections of the Act grant powers which would permit consideration of the proper accounting for expenditures such as those here in controversy. These are the sections authorizing the Commission to determine what are "excessive profits" of licensees (§ 10(d)) (16 U.S.C.A. § 803(d)), and to regulate the rates of licensees (§§ 19 and 20) (16 U.S.C.A. §§ 812, 813), and public utilities (§ 205(a)), (16 U.S.C.A. § 824d(a)). The setting up of appropriate accounting procedures would appear to be a logical preliminary to rate fixing.

In its opinion accompanying the order here under review, the Commission referred to and cited as precedent for its decision, an interpretative ruling referred to as "Interpretation E-110, Issued Nov. 27, 1945". The text of that ruling, in question and answer form, appears in the margin.[18] This ruling was actually issued as a part of Bulletin No. 7 of the National Association of Railroad and Utilities Commissioners and was prepared by that Association's Committee on Statistics and Accounts. The records of the Commission show that it, as in the past, considered such rulings of that Association as acceptable rulings with respect to its own system of accounts.

Petitioners vigorously assail Interpretation E-110 as having no validity in this proceeding. They assert that it was not promulgated as a rule or regulation of the Commission; was never published in the Federal Register; that it lay dormant without citation or action following its promulgation for years during which expenditures similar to the ones here involved had been charged to Account No. 787 without question by the Commission. It is said that the National Association of Railroad and Utilities Commissioners itself dropped the ruling by eliminating it from its own reports.

We think there is no occasion to discuss the question whether "Interpretation E-110" was a part of the rules and regulations of the Commission. The Commission could appropriately refer to it in the same manner in which it might refer to a textbook on accounting or to a decision of a state or federal court, or to a decision of a state utilities commission. The Commission's reference to that interpretation was sufficient to show that at the time of the issuance of the interpretation persons informed in this field were of the view that the cost of advertising for purposes mentioned in said ruling should be charged to Account No. 538.[19]

As we have previously noted, the parties here are in sharp disagreement as to just what the Commission's order does and as to what its effect will be. See footnote 15, supra. The petitioners challenge the statement of the Commission quoted above, in that footnote, to the effect that who shall ultimately pay these particular expenses must await rate proceedings and that "an accounting classification matter of this kind does not involve determining the just and reasonable rates for the utility." The petitioners say in their brief: "When a particular

18. "Question: What is the proper account to be charged with nonpromotional advertising of the type sometimes referred to as institutional advertising or as goodwill advertising, the purpose of which is to foster and maintain public goodwill rather than for any immediate and direct promotion of sales of electricity or appliances?

"Answer: Such advertising should be charged to Account 787.2, Advertising; however, Account 538, Miscellaneous Income Deductions, should be charged with the cost of any advertising for the purpose of influencing public opinion as to the election of public officers, referenda, proposed legislation, proposed ordinances, repeal of existing laws or ordinances, approval or revocation of franchises, for the purpose of influencing decisions of public officers; or having any direct or indirect relationship to political matters."

19. No problem arises under § 3 of the Administrative Procedure Act, (5 U.S.C.A.

§ 1002), relating to publication in the Federal Register. The order here under review related solely to the proper accounting of expenditures for eight specific advertisements. This was not an order of general applicability. It was a ruling directed solely to certain named respondents requiring action by them alone. Reconstruction Finance Corp. v. United Distillers Products Corp., D.C., 113 F.Supp. 468, 481, aff. 204 F.2d 511, (2 cir.); Brownell v. Schering Corp., D.C., 129 F. Supp. 879, 904-905, affirmed 228 F.2d 624, (3 cir.).

In the case of Securities and Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995, the Supreme Court made it plain that a commission such as this may carry out its function either by general rule to be applied in the future, or by *ad hoc* adjudication through an individual order. The latter is the sort of ruling which we have before us here.

item of operating expense is forced 'below the line' it stays there."[20]

Of course the order here under review does not prohibit these advertisements; there is no order to cease or desist from their publication. The Commission expressly stated that the accounting classification called for by the order "does not involve determining the just and reasonable rates for the utility."[21] In support of this view, the Commission cited Northwestern Electric Company v. Federal Power Comm'n, 321 U.S. 119, 123, 64 S.Ct. 451, 88 L.Ed. 596.[22]

The Commission argues that the order here involved simply implements the primary purpose of § 301 which was to provide for "regulation by the informatory process". It was noted that some of the respondents were companies which have no rates subject to regulation by the Commission, but nevertheless the companies may be subject to the regulation provided by § 301 as licensees and in such cases compliance with the requirements of the Commission's system of accounts in the respect here involved would serve to alert State Commission and investment agencies to the fact that in the opinion of the Commission these advertisements were political in character and their treatment as costs of service was dubious.[23]

20. On oral argument counsel for petitioners in answer to a question from the bench as to whether they would not have a full day in court to challenge the merits of the order, when rate making comes before the Commission, replied, "No, when they are kicked in the teeth, we submit that they stay kicked in the teeth, and that is what these people are trying to do."

We note that subsequent to the order here involved, the Commission issued a revised system of accounts, effective January 1, 1961, which contains an Account No. 426, apparently intended to replace Account No. 538. It is described as follows: "This account shall include miscellaneous expense items which are nonoperating in nature but which are properly deductible before determining total income before interest charges." Attached is a footnote as follows: "Note: The classification of expenses as nonoperating and their inclusion in this account is for accounting purposes. It does not preclude Commission consideration of proof to the contrary for ratemaking or other purposes."

21. The Commission's opinion also stated: "And since these accounting classifications proceedings do not disturb any of the respondents' property or other rights, which are subject to determination not here but in rate proceedings, there is no deprivation of property without due process of law." Commissioner Kline, concurring in the earlier opinion upholding the exclusion of the proffered evidence, stated: "In a rate proceeding, items above the line are often disallowed as proper charges against the rate payer. Likewise in a rate case, items entered below the line as proper, necessary, just and reasonable outlays may be allowed as a part of the cost of service. On the ground that this is not a rate case and that a rate case is a better proceeding in which to raise the matters here sought to be resolved, I concur with the majority."

22. The Northwestern Electric Company case was similarly cited in Pacific Power & Light Co. v. Federal Power Commission, 9 cir., 141 F.2d 602, 604, where the court had under review an order of the Commission requiring a certain entry in the electric plant accounts of Pacific Power to be charged to income over a ten year period. The Company claimed that compliance with the order of the Commission would distort its base for rate making purposes. As to this contention the court said: "This is not a proceeding for the fixing of rates". It stated: "The present case, like that involving the Northwestern Electric Company, appears to us to present no more than a problem of proper accounting". The court also noted, as did the Supreme Court in the Northwestern Electric Company case, supra, 321 U.S. at p. 124, 64 S.Ct. 451, "Nothing in the statute or the order prevents Northwestern keeping other accounts if it so desires which will give information with regard to estimated present appreciated value of its assets." (In each case the Commission had made orders requiring the elimination of appreciated assets.) Cf. Alabama Power Co. v. Federal Power Commission, 5 cir., 134 F.2d 602, 611: "The Commission's accounts do not at all affect the State rates. If in the future federal rates are fixed it will be time enough to decide what effect the Commission's accounting orders are to have."

23. Commission counsel refer to the Federal Regulation of Lobbying Act, 2 U.S.C.

There is no question here but that the order to classify these expenditures in account No. 538 has a serious impact upon the petitioners. Counsel for the Commission concedes that they are aggrieved persons, which implies that the order, even if it is not conclusive, with respect to rate determinations, would appear to put heavy burdens of proof upon the petitioners whenever they are confronted with rate hearings. They could, as the Northwestern Electric Company case, supra, suggested they might, keep other accounts. They would be at liberty to argue before the State regulatory authorities that these expenditures were properly charged as a part of the cost of service and as operating expenses. Yet the fact that these accounts which conformed to the Commission's uniform system of accounts would show these expenditures listed under income accounts and "below the line", would add to any such company's burden of proof in state rate proceedings. The Commission's counsel conceded that this was the intended purpose of the order.[24]

Assuming that the Commission had authority to give special treatment in its system of accounts to these particular expenditures, what is the basis for requiring them to be charged to income and is this within the authority of the Commission? [25]

The answer given by the Commission to this question was as follows: "Furthermore, the classification of these expenditures below the line as income deductions is necessary and appropriate for purposes of administering the Act and is reasonable thereunder. The political expenditures of utilities fall into a peculiar category. By their nature, such expenditures obviously have a doubtful relationship to rendering utility service. Hence, the classification of such expenditures routinely to operating expenses would not be consistent with the objectives of utility accounting regulation, which aims at the separate disclosure and classification of all such controversial items, so as [to] enable a clear understanding and realistic appraisal of the nature thereof. Throwing all such controversial expenditures into a hotchpotch of operating expenses would tend to obscure their essential character, and make more difficult their informed analysis and proper ultimate disposition.

"Other considerations also justify the classification of political expenditures such as these to deductions from income rather than to operating expenses. The function of electric utilities and licensees under the Power Act is, in accordance with the requirements of the Act, to render public service in a business affected with a public interest; and it is fair and reasonable to require the customers to pay the expenses properly incurred by the companies in rendering this service. However, on matters which are politically controversial, differences of opinion may and frequently do exist between the companies and their customers, between management and the rate payer. The classification generally of political expenditures to operating accounts might seem to imply that such expenditures must in due course and without further question be paid by the rate payer. Such an implication would be unwarranted and

§§ 261–269, and portions of the Federal Corrupt Practices Act, 2 U.S.C. §§ 243–247, as illustrations of "regulation by the informatory process." .

24. Counsel at the oral argument stated: "The basis of the Commission's doing this was to put a flag on that expenditure, a cautionary signal, a yellow light, saying: Watch out; this kind of expenditure is within a controversial area. Anybody that looks at it—a securities analyst who looks at it, a consumer's representative who looks at it—says: here is something the Commission thinks needs a yellow light on it."

25. The Commission's new Uniform System of Accounts, effective January 1, 1961, lists under "Operation and Maintenance Accounts" an Account No. 930 "Miscellaneous general expenses" of which one suggested item is "Institutional or goodwill advertising". Whether the advertising we here consider might have been so classified we have no occasion to consider here.

possibly unfair, in view of the fact that on politically controversial matters, the opinions of management and the rate-payer may differ decidedly. Thus this accounting classification, while isolating and identifying these controversial expenditures, appropriately avoids any implication that the companies are entitled without a further showing to charge against the rate payer the cost of political programs favored by the companies but possibly opposed by those who must pay the costs of supporting these enterprises."

■ We must assume that even if we disagree with this decision of the Commission that these expenditures should be assigned to Account 538, that disagreement would not of itself warrant our setting aside the Commission's determination. "It is a fundamental principle * * * that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" American Power & Light Co. v. S. E. C., 329 U.S. 90, 112, 67 S.Ct. 133, 91 L.Ed. 103.

■ Since the Commission was authorized as we have seen to deal with expenditures such as these, and to prescribe where they shall be classified under the Commission's system of accounts, it is plain that in stating that they should be classified below the line as income deductions the Commission was taking action within its discretionary authority to determine what would be appropriate for purposes of administration of the act.[26]

We have noted the broad scope which § 301 of the Act gives to the discretion and determination of the Commission. Under such circumstances the Supreme Court has said: "In a matter left specifically by Congress to the determination of an administrative body * * * the function of review placed upon the courts * * * is fully performed when they determine that there has been a fair hearing, with notice and an opportunity to present the circumstances and arguments to the decisive body, and an application of the statute in a just and reasoned manner." Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301.[27]

Manifestly the Commission might have chosen to give these expenditures a special category in a manner less drastic, —one that would "place a flag" on them, but still leave them "above the line", as

26. The Supreme Court has held many times that one seeking review of an administrative order of this character may not come into court to "review action within the discretionary authority of the Commission". "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Rochester Tel. Corp. v. United States, 307 U.S. 125, 133, 146, 59 S.Ct. 754, 83 L.Ed. 1147. To upset the determinations expressed in the portions of the opinion of the Commission last quoted petitioners must demonstrate that there has been an abuse of discretion. "This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of·action here involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles of correct accounting' * * * as to be the expression of a whim rather than an exercise of judgment." American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 236–237, 57 S.Ct. 170, 81 L.Ed. 142.

In Securities and Exchange Comm'n v. Chenery Corp., supra, 332 U.S. at p. 207, 67 S.Ct. 1575, 91 L.Ed. 1995, the Court said: "The scope of our review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action. The wisdom of the principle adopted is none of our concern."

27. The Court said, "Where, as here, a determination has been left to an administrative body, this delegation will be respected and the administrative conclusion left untouched."

costs of operation. It might have given them a classification similar to Account 926 in the 1961 Uniform System where "Institution or Goodwill advertising" is indicated to be classified "above the line". But the choice is solely that of the Commission. In American Power & Light Co. v. S. E. C., supra, where the Commission had ordered dissolution of two holding companies, the Court noted the argument that dissolution could have been avoided as follows: "Emphasis is placed upon alternative plans which are less drastic in nature and which allegedly would meet the statutory standards." The Court answered this contention in the language we have quoted, supra, and cited Phelps Dodge Corp v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 to the same effect.[28]

We cannot disturb this determination of the Commission or hold its conclusions to be an abuse of discretion if there be a rational basis for its conclusions and warrant in the record for its judgment. It cannot be said that the Commission's conclusion here lacked a rational basis. Fourteen years previous to the making of this order the National Association of Railroad and Utilities Commissioners had concurred in the issuance of Interpretation E-110, previously described. That body was presumably composed of persons qualified to give a rational answer to the question there propounded. That fourteen years had elapsed since the date of that determination without its being cited is not significant here where it does not appear that the Commission had during that period been confronted with any such propaganda campaign as the one represented by these advertisements.

The Commission properly noted that these electric utilities and licensees were engaged in a business affected with a public interest; and that in respect to matters that are politically controversial there may be differences of opinion which exist between the companies and their customers.[29] The customer of a public utility has a special interest in what constitutes the rate base of the utility. It is not irrational to note that such a customer might well be strongly opposed to the arguments contained in these eight advertisements and might well feel much aggrieved if he is informed that his money is helping to pay for this publicity campaign.

Counsel for the Commission argues that the legislative history of the Act of August 26, 1935, discloses that the broad powers granted in § 301 were designed for use in classifying expenditures such as these according to a "political-in-character" test. Petitioners take vehement exception to this reference to legislative history, calling it "Rationalization at its Worst, Evils of a Past Generation Resurrected." They say that in referring to reports of "massive propaganda activities of the private electric utility industry", which preceded enactment of this Act, Commission counsel have "disinterred" something more than 30 years old, and which was not listed in the Act

---

28. "Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy."

29. It seems reasonable to note that there is a substantial difference between the advertising expenditures of an ordinary industrial corporation, such as a manufacturing company, and those of a public utility. If the management of a manufacturing concern chooses to expend its funds in advocating certain views respecting matters of political controversy, the only persons in a position to make an objection are the stockholders who have a remedy through their voting rights. The customer of the manufacturing concern is not necessarily affected as the price he pays for the product is probably fixed by competition in the market place, certainly not by any public commission.

as an evil; that reference to this "is obviously a device to pillory and demean the petitioning companies."

The typical case in which legislative history is most useful is one where there is doubt or ambiguity in the terms of an Act. For reasons we have mentioned we think there is no doubt or ambiguity as to the meaning of § 301; it plainly confers power to regulate and to establish a system of accounts,—a power which is as broad and all-inclusive as words can make it. We have not been able to find, in any report on the particular bill which became this enactment, or in any remark in Congress by the managers of the bill, saying, in so many words, that § 301 was designed to allow the Commission to "put a flag" on expenditures such as these, or to see to it that they were not charged to operating expenses.[30]

It is possible that the powers to regulate public utility accounts granted in § 301 were designed to control these practices mentioned in the Federal Trade Commission document. But nothing we can find in the legislative history makes any express statement to that effect. § 1 of the Act, (now found in Title 15 U.S.C.A. § 79a) enumerated certain abuses which were proposed to be eliminated. All of these related to the practices of public utility holding companies and their subsidiaries. The fierce and acrimonious debates which preceded passage of the bill related almost exclusively to the holding company aspects of the legislation. We think the legislative history does not have the impact counsel for the Commission attach to it.

However, the Federal Trade Commission report is not without other significance here. For we are considering

30. The bill, and the Act as passed, had provisions relating to four different aspects of the utility business. Title I of the Act dealt with public utility holding companies. (Its provisions are now found in Title 15 U.S.C.A. §§ 79 to 79z–6.) Title II contained three parts: First, were sundry amendments to the Federal Water Power Act of June 10, 1920 (41 Stat. 1063), and provision making the 1920 Act, as amended, Part I of the "Federal Power Act"; second, Part II was added, headed "Regulation of Electric Utility Companies Engaged in Interstate Commerce"; and finally, Part III was included, headed "Licenses and Public Utilities; Procedural and Administrative Provisions". § 301 is the first section in this Part III.

Section 1(b) of the Act recites certain sources of facts on the basis of which the legislation is enacted. It lists, among others, a report of the Federal Trade Commission. This report, 101 volumes in length, entitled "Summary Report of Federal Trade Commission to the Senate of the United States Pursuant to Senate Resolution No. 83, 70th Cong., 1st Sess., On Holding and Operating Companies of Electric and Gas Utilities" contains some lengthy discussions of such companies' methods of accounting, of their efforts to influence public opinion, and their publicity and propaganda activities.

In Part 73(a) of this Document No. 92, in chapter XIV, which is headed: "Conclusions and Recommendations" reference is made to some 19 so-called "evil conditions and practices". No. 13 is "Deceptive or unsound methods of accounting for assets and liabilities, costs, operating results and earnings, including writeups unrealized fictitious profits, stock dividends," etc. Part 71(a) relates to "Efforts by associations and agencies of electric and gas utilities to influence public opinion." This entire volume is devoted to a discussion of this subject including such items as the following: "In emphasizing that the work was worthwhile, M. A. Aylesworth, then the director of the National Electric Light Association, advised utility executives not to be afraid of the expense in permitting large numbers of their employees to attend conventions because 'the public pays'. This is literally true as the cost of all the public relations work is usually charged up as operating expenses by the utility companies."

Part 81(a) of this report is entirely devoted to its stated subject of "Publicity and Propaganda Activities by Utilities Corporations and Companies". Pages 141 to 146 of that volume contain a discussion of "political activities in the State of Washington." This was a description of the expenditures by electric utility companies in that State to defeat certain legislation; also a description of activities by the utilities generally in state and local matters such as propaganda against municipal ownership and efforts to forestall and defeat regulation.

whether the decision of the Commission that these expenditures should be reclassified in Account No. 538 is a reasonable one—whether it has a rational basis. And relevant to that inquiry is the fact, if it be a fact, that many students of such questions have been of the opinion that arguments by the utilities against public power, or the government's public power program, ought not to be paid for as operating expenses and that such expenditures ought not to figure in rate-making or be charged to consumers. The Report of the Federal Trade Commission reflects that view. We cannot say that the Congressional majorities who passed the bill that became this Act, after one of the most intense and heated legislative battles in American history,[31] would have considered that view untenable.[32]

In its opinion the Commission referred to these expenditures thus ordered reclassified under Account 538, as "political expenditures, including expenditures for political advertisement". The Commission spoke of the "essential political character" of the advertisements, stating that they related to matters which are "politically controversial". Petitioners say: "The would-be test 'political in character' is too indefinite and uncertain to constitute a valid basis of classification". They go on to say that these terms are too vague, indefinite and uncertain to provide meaningful criteria on which either legislation or a rule or regulation may be predicated. We think that

no problem is presented by the facts of this case; there is no situation here calling for an answer to a question as to whether a precise guide or certain standard for conduct has been furnished.

The Commission was not laying down any general rule for future action in all cases. All that this order did was to direct a specific reclassification of expenditures for eight definitely identified advertisements. Since the order adequately identified that to which it was directed, it would appear to be wholly immaterial what appellation is given to these advertisements, whether they be called "political" or referred to by some other name. It appears to us that the description "political in character" is about as useful a shorthand description of these advertisements as could be desired. The advertisements show on their face that they are all similar in the message which they purport to convey. The Commission described them adequately, we think, as follows: "Viewed generally, it is clear from their face that, with the exception of the first advertisement, they deal with a political controversy, the private-public power dispute, and hence involve the presentation of argument in matters of political controversy. Considered more particularly, a scrutiny of the advertisements and a reading of their texts discloses that they have as a basic ultimate purpose the influencing of public opinion as to the repeal of existing law." [33]

---

31. For an account of this see Schlesinger, "The Age of Roosevelt, The Politics of Upheaval", Chapter 17, "The Utilities on the Barricades", pp. 302–324.

32. In 1935, during the period when this legislation was under consideration, a special Senate Committee headed by Senator Black investigated the lobbying activities carried on while the bill was under consideration. "Investigation of Lobbying Activities, Hearings, U. S. Senate, 74th Cong., 1st Sess. 1935." In a radio address which was printed in the Congressional Record (August 9, 1935, Vol. 79, Part 12, pp. 12770–12772), Senator Black gave a summary of the testimony before the Committee in which he asserted that "the power lobby in this matter will be

known as the $5,000,000 lobby." He spoke of "a flood of telegrams and a deluge of letters" and said: "Most of the expenses have come from the individual companies themselves, and have been charged up to operating expenses of the various local power company units. You who listen to me can rest assured that a part of the expenses of the campaign against this bill has most likely been charged to the operating expenses of the company supplying the electricity for the light in your room at this very moment. In other words, you will pay the bill."

33. "These facts appear from the advertisements themselves, and no other evidence is necessary to confirm them. Thus the

It seems plain to us that it was within the competence of the Commission to give these particular advertisements a special classification and to deal with them whether by the use of the word "political" or some other term, as items which should be placed in a special category. The Commission had the right, we think, to view these advertisements as a calculated effort to revive the old battle against public power, and to sell these ideas to the public. Its determination that expenditures for such a campaign should be separately classified as "Miscellaneous Income Deductions" for accounting purposes is something we are not permitted to reverse.

Some of the witnesses whose testimony was offered undertook to testify that in their opinion these advertisements were not political in character, giving their definitions of "political".[34] The Commission's opinion shows that it considered this evidence but that it deemed the matter "of insufficient weight to establish that the advertisements are in fact nonpolitical in character."

These expressed opinions of the proffered witnesses were no more effective in negativing the administrative conclusion than were the opinions of the Court of Appeals which disagreed with administrative decisions as to the meaning of the words "producer", Gray v. Powell, supra, and "employees", National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170. As suggested above, in essence the Commission's decision here may be stated without any reference to the word "political". Without applying any descriptive phrase to these questioned advertisements, what the Commission has done is to say that the expenditures for these particular eight advertisements must be reclassified to Account 538.

---

message conveyed by most of the advertisements in Appendix A is that federally supported electric systems and power dams are relieved of tax burdens which taxpayers generally must pay, resulting in favoritism to consumers who get electricity from such installations at cheaper rates, and in unfair discrimination against taxpaying utilities and taxpayers generally who do not receive such tax concessions. This idea is also conveyed by the captions and illustrations of the advertisements. The text of six of the advertisements—Nos. 2, 3, 4, 5, 6 and 7—call specific attention to present tax laws as the cause of this condition. The other two speak of 'tax favoritism' and 'trick' taxes. The text of several of the advertisements, including Nos. 4, 5, 6 and 7, includes the suggestion that 'something ought to be done' about this tax favoritism or that it should be 'given critical study.' Although more obvious in the case of some than others, we think it is reasonably apparent that advertisements Nos. 2 through 9 are aimed at influencing public opinion to secure legislation to correct these claimed tax inequities. Thus all of the questioned advertisements, with the exception of No. 1, are political in character, and under our System of Accounts the costs thereof should be classified to an income deductions account, specifically Account 538."

34. Thus Dr. Wm. A. Paton, a professor of economics and of accounting and author of books on accounting and accounting theory, in a sworn statement which was offered in proof before the examiner, gave his opinion that Interpretation E–110 would not require that the expenditures here in question be charged to Account 538. It was his view that the words "having any direct or indirect relation to political matters" contained in the text of that interpretation would not operate to suggest a charge of the expenditures here involved below the line. It was his view that those advertisements were non-political in character.

Dr. H. G. Guthmann, a professor of finance, a certified public accountant, a former national president of the National Finance Association, and an author of books on finance and financial policy, in like manner was offered as a witness to testify according to his prepared testimony that the questioned ECAP advertisements were non-political in character because they had been published for the purpose of meeting the competition of governmental agencies in the power field. "It is unreasonable to put the 'political' label on an activity that is a regular part of business competition merely because the ideas communicated may have incidental legislative, tax or similar consequences."

The Commission did not question but that the proffered evidence would show that the advertising served other purposes such as meeting competition, protecting the companies' markets, and explaining the reasons for their rates to the companies' customers. But the decision of the Commission was obviously that whether these advertisements did or did not serve some additional purposes, they nevertheless showed on the face of the advertisements themselves that while the text differed in phraseology, they were uniform in denunciation of unfair discrimination against taxpaying utilities and taxpayers generally; complaining of "favoritism", and "trick", and generally concluding with the suggestion that "something ought to be done" about this "unfair tax favoritism." [35]

Since this administrative determination was within the discretion of the Commission, it seems plain that reversible error cannot be predicated upon its exclusion of testimony which under its determination would be irrelevant and immaterial.

Finally, the petitioners assert that the Commission's action "limits and penalizes speech which the Constitution makes free in violation of the First Amendment and deprives the companies of property rights without due process of law in violation of the Fifth Amendment." We are unable to find here any basis for an argument of this character. As we have noted, nothing in the order prohibits or restrains the petitioners from publishing or republishing these or any other similar advertisements. Their freedom of speech or freedom of action in this area are not in any manner limited. All that has occurred in this proceeding relating to keeping of accounts is to exercise the Commission's discretion as to where these expenditures should be entered and to do so in such manner as to indicate the views of the Commission that such expenditures should not be subsidized by the consumers who purchase the power; that those expenditures should be charged to an income account.

In our opinion the order here involved did not impinge upon any constitutional rights of the petitioner any more than did the Internal Revenue regulation applied in Cammarano v. United States, 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462. In that case, the Court said: "Petitioners are not being denied a tax deduction because they engaged in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, as every one else engaging in similar activities is required to do under the provisions of the Internal Revenue Code."

Here it may be said that these petitioners are not being denied the right to charge the cost of this advertising as operating expenses because they engage in constitutionally protected activities; they are simply being required to keep their books in such manner as to indicate that presumptively those activities are to be paid for out of their own pockets rather than passed on to the consumer.

The order of the Commission is

Affirmed.

35. The Commission's opinion states: "Assuming arguendo that respondents' proffered evidence shows that the expenditures have some other additional or subsidiary aspect or purpose—that, for example, they were necessary to meet governmental competition, to protect the companies' markets, and to preserve their financial well-being—this would not detract from their fundamentally political character, nor would it justify classifying them under our System of Accounts other than in the manner we find to be appropriate for political expenditures."