**MINCHUMINA NATIVES, INC., Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT OF INTERIOR, Defendant–Appellee,**

and

**State of Alaska; Minchumina Homeowners Association, Defendants–Intervenors–Appellees.**

No. 93–35841.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1994.

Decided March 30, 1995.

Amended July 18, 1995.

Michael J. Walleri, Tanana Chiefs Conference, Anchorage, AK, for plaintiff-appellant.

Albert M. Ferlo, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.

John T. Baker, Asst. Atty. Gen., Anchorage, AK, for State defendant-intervenor-appellee.

Heather H. Grahame, Bogle & Gates, Anchorage, AK, for Minchumina Homeowners Ass'n defendant-intervenor-appellee.

Before: PREGERSON, CANBY, and BOOCHEVER, Circuit Judges.

## ORDER

The opinion filed March 30, 1995, is amended as follows:

At slip opinion page 3501 [51 F.3d at 222], delete the second sentence of the second full paragraph (the first paragraph of the BACKGROUND section) and substitute the following:

> The Native wife of Tom Flood and the children of Val Blackburn (who are also Native because they possess more than one-quarter degree of Native blood)[1] formed Minchumina Natives, Inc., in order to seek recognition and benefits as a Native group.

At slip opinion page 3507 [51 F.3d at 225], delete the first two sentences of the third paragraph and substitute the following:

> MNI asserts that within the boundaries of the locality originally recognized by the BIA, the population density was seven persons per one quarter of a mile, or 28 persons per square mile. The government disputes this figure, but in any event it is clear that, with the addition of the Holmes residence and the FAA site, the population density shrank substantially, to a mere ten persons per square mile.

With these amendments, the petition for rehearing is DENIED.

## OPINION

CANBY, Circuit Judge.

Minchumina Natives, Inc. ("MNI"), a group of seven Alaska Natives claiming to reside near Lake Minchumina, Alaska, seeks recognition as a "Native group" under the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1629. MNI can qualify as a "Native group" only if its Native members "comprise a majority of the residents of the locality." *Id.* at § 1602(d); *see Chugach Alaska Corp. v. Lujan,* 915 F.2d 454, 457–58 (9th Cir.1990). Whether they constitute a majority depends entirely upon how the boundaries of "the locality" are drawn; those boundaries are the subject of this appeal.

The Bureau of Indian Affairs initially accepted the narrow boundaries claimed by MNI, which enclosed the smallest area that included all of the members' residences. Those boundaries, however, were expanded by an administrative law judge and then again by the Interior Board of Land Appeals. After disqualifying those who were not resident on the crucial date of April 1, 1970, the Board found that the expanded locality included four Natives and six non-Natives. It accordingly denied recognition of MNI as a Native group. The district court affirmed, and MNI appeals.

We vacate the decisions of the district court and the Board, and order the case remanded to the Board for further proceedings.

## BACKGROUND

Val Blackburn and Tom Flood were non-Native trappers, who moved into the Lake Minchumina area, in the center of Alaska, after the federal government constructed an airstrip at the edge of the Lake during World War II. The Native wife of Tom Flood and the children of Val Blackburn (who are also Native because they possess more than one-quarter degree of Native blood)[1] formed Minchumina Natives, Inc., in order to seek recognition and benefits as a Native group.

At the times in issue, there were only a few other households around Lake Minchumina, some near the Blackburns and Floods on the West side of the Lake, and others farther away on other shores. The nearest towns are nearly one hundred miles away by air.

---

1. In relevant part, 43 U.S.C. § 1602(b) states: "Native" means a citizen of the United States who is a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community) Eskimo, or Aleut blood, or combination thereof.

In 1976, MNI filed with the Department of the Interior an application for recognition as a Native group. That category was designed for the benefit of communities of Natives which, because of their sparse population, were ineligible to qualify as Native villages. *See* 43 U.S.C. § 1602(c). Under 43 U.S.C. § 1602(d), a Native group is "any tribe, band, clan, group, village, community or association of Natives in Alaska composed of less than twenty-five Natives, who comprise a majority of the residents of the locality." Among other benefits, a recognized Native group is entitled to receive fee title to as many as 320 acres of public land per member in the area in which the group lives.[2] *See* 43 C.F.R. § 2653.6(b).

Seven years after MNI applied, the Bureau of Indian Affairs determined that the group was eligible for recognition. After examining the history and geography of the Lake Minchumina area, the BIA determined that the locality included the lands of the Flood and Blackburn families and the land between their homes. Within this locality, the Native residents outnumbered non-Native residents and, thus, the group was eligible for recognition.

Non–Native homeowners in the area, who alleged they would be adversely affected by the grant of public lands to the group, appealed the BIA's ruling and obtained a reversal. The administrative law judge drew the boundaries of the locality more widely than had the BIA, bringing in an additional non-Native resident. The ALJ also ruled that one of the Blackburn children, who was away attending college on the relevant date, should not be considered in the equation. The ALJ concluded that, in all, the locality contained three Natives and three non-Natives—not a Native majority as required for recognition.

MNI appealed the ALJ's decision to the Interior Board of Land Appeals. After a de novo review, the Board held that the Native student who was away at college should be considered a resident of the locality. The Board, however, drew the boundaries of the locality even more expansively than had the

administrative law judge. First, it included the Federal Aviation Administration ("FAA") land comprising the airport, because the access to the airport was open and the FAA facilities, such as a telephone and meeting room, had been used by the community.

The Board also included in the locality the Holmes residence, which was separated from the center of the new locality by the airport. It included the Holmes residence even though it was not located in the "same relative proximity" as others in the area, for two reasons: (1) the Holmeses would be affected if land adjacent to theirs were conveyed to MNI, and (2) the Holmes residence was the location of the electric power plant, store, and telephone for those at the lake. With the addition of the Holmeses, and a man named White who lived at the FAA installation at the Lake Minchumina airport, the non-Natives outnumbered the Natives in the Minchumina locality. According to the Board's final tally, the locality encompassed four Natives and six non-Natives.

MNI appealed the Board's decision to the district court. The district court ruled that the Board erred in its first reason for including the Holmeses; the fact that MNI might select land adjacent to the Holmeses was not an appropriate reason for including them in the locality. The district court nevertheless affirmed the inclusion of the Holmeses on the ground that they were in "relative proximity" to the rest of the community, and because of the amenities (power, groceries, telephone) that they provided to members of MNI and others bordering the Lake. The Natives now appeal the district court judgment.

## ANALYSIS

### I. Introduction.

MNI now renews its contention that its members constitute a majority of the residents of the locality, entitling it to federal recognition under 43 U.S.C. § 1602(d). As we have seen, the result hinges on how expansively one defines the locality.

---

**2.** In ANCSA, Congress gave Alaskan Natives rights to public land and monetary payments to settle the Natives' aboriginal claims to literally hundreds of millions of acres of Alaskan lands. Felix S. Cohen, *Handbook of Federal Indian Law* 198, 746 (1982).

ANCSA itself does not define "locality." In regulations that we have upheld, *see Chugach,* 915 F.2d at 457–58, the Interior Department has set forth some of the characteristics of a locality:

> The Native Group must have an identifiable physical location. The members of the Group must use the group locality as a place where they actually live in permanent structures used as dwelling houses. The Group must have the character of a separate community, distinguishable from nearby communities, and must be composed of more than a single family or household.

43 C.F.R. § 2653.6(a)(5).[3] In *Tanalian, Inc.,* 75 I.B.L.A. 316 (1983), the Board supplemented these regulations:

> The "locality" must encompass the greater area in which other residents live in relative proximity, as compared with the population density of lands beyond the area so designated. Evidence of the extent to which residents of the area share common interests or concerns in the local amenities, facilities, and services may be received as indicative of the geographic area of the locality.

■ Because Congress failed to define locality when it used the term in 43 U.S.C. § 1602(d), and because the Interior Department is the agency charged with implementing ANCSA, we defer to its interpretation of the term. *Chugach,* 915 F.2d at 457; *see also I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). We further accept the Board's *Tanalian* approach as a reasonable and consistent interpretation of locality, *see Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941), which the Board has continued to cite and rely on. *See Chugach Natives, Inc. The Grouse Creek Corp.,* 80 I.B.L.A. 89, 93–94 (1984).

## II. Alleged Departures from the *Tanalian* Standard.

MNI presents three arguments based on *Tanalian.* First, MNI contends that the Board ignored the concept of "relative proximity" as it was considered in *Tanalian,* and instead relied on an improper factor, the impact of MNI's land selection. Second, MNI contends that the Board disregarded *Tanalian*'s population density inquiry in determining the locality. Finally, MNI argues that the Board improperly considered "amenities" provided in the 1960s in determining that the FAA facility was part of the locality in 1970.

### A. Impact on Other Residents.

■ Although the Board found that the Holmeses "did not live in the same relative proximity as the others in the area," the Board included the Holmes site within the locality. According to the Board, Congress designed the majority requirement in order to limit the adverse effects that recognition might have on non-Natives; because recognition of the Minchumina Natives would lead to land transfers that might adversely affect the Holmeses, the inclusion of the Holmeses in the locality furthered this purpose even though they were not in the same relative proximity as other local residents included in

---

3. Stated more fully, the regulations provide:

> The Bureau of Indian Affairs shall determine whether the members of a Native group actually reside in and are enrolled to the locality specified in its application. The Bureau of Indian Affairs shall specify the number and names of Natives who actually reside in and are enrolled to the locality, including children who are members of the group and who are temporarily elsewhere for purposes of education, and it shall further determine whether the members of the Native group constitute the majority of the residents of the locality where the group resides. The Bureau of Indian Affairs shall determine and identify the exterior boundaries of the Native group's locality and the location of all those permanent structures of the Native group used as dwelling houses.... The Native group must have an identifiable physical location. The members of group must use the group locality as a place where they actually live in permanent structures used as dwelling houses. The group must have the character of a separate community, distinguishable from nearby communities, and must be composed of more than a single family or household. Members ... must actually have resided there as of the 1970 census enumeration date and must have lived there as their principal place of residence since that date.
>
> 43 C.F.R. § 2653.6(a)(4)–(5).

the locality. *See Minchumina Natives, Inc.*, 122 I.B.L.A. 375, 397–98 (1992).

This ruling constituted an error of law, as the district court correctly held. It is true, as the government points out, that the Board fashioned the *Tanalian* criteria and it is free to change them. But the Board is not free to adopt a standard that is inconsistent with departmental regulations or ANCSA. The practical effect of the land selection on other area occupants is not mentioned in the Interior Department regulations. *See* 43 C.F.R. § 2653.6(a)(4)–(5). If it is included as a determining factor, it may result in the inclusion of residences in the locality which would not otherwise be regarded as part of the community. A Native group may be entitled to select as many as 7,680 acres of land surrounding their locality. 43 C.F.R. § 2653.6(b)(1). If persons adjacent to the outer edges of such a selection are to be included in the locality merely because they are affected by the land selection, the locality may become so diffuse as to lose its character as a "separate community, distinguishable from nearby communities." 43 C.F.R. § 2653.6(a)(5). We conclude that neither ANCSA nor the regulations contemplated any such consideration of "impact" in determining locality.[4] In this regard, the Board erred.

### B. Population Density as a Measure of Relative Proximity.

■ MNI also contends that the Board erroneously failed to give adequate weight to the relevant population densities in determining the scope of the locality.

In *Tanalian*, the Board explained that population density is a yardstick for determining whether residents are relatively proximate to one another and thus whether they reside in the same locality. For example, if the population density within the boundaries of the locality is significantly greater than the density in nearby areas outside the boundaries, that disparity supports the view that the residents are proximate to one another and the locality has been defined properly.

MNI asserts that within the boundaries of the locality originally recognized by the BIA, the population density was seven persons per one quarter of a mile, or 28 persons per square mile. The government disputes this figure, but in any event it is clear that, with the addition of the Holmes residence and the FAA site, the population density shrank substantially, to a mere ten persons per square mile. In short, the locality defined by the Board was markedly less dense than the area proposed by the Natives. Thus, MNI argues, the Board failed to give proper weight to population density and drew the boundaries of the locality incorrectly.

■ Here, however, we cannot conclude that the Board erred in applying its own standard. The Board referred in its decision to *Tanalian*'s population density factor. Although the locality as defined by the Board and the district court is significantly less dense than the area defined by MNI, the locality may nevertheless satisfy the relative proximity prong of *Tanalian*. The record indicates that the locality still has a significantly higher density than "nearby lands beyond the area so designated." Thus, the Board's treatment of population density is not inconsistent with *Tanalian* or with the governing regulation or statute. On this issue, we may not substitute our judgment for that of the Board. *See Cranston v. Clark*, 767 F.2d 1319, 1321 (9th Cir.1985).

### C. Inclusion of the FAA Facility.

MNI argues that the Board improperly relied on social activities during the 1960s to determine whether the FAA facility was

---

4. At oral argument the government suggested that our decision in *Chugach* supported the Board's use of the practical effects of recognition on others as a factor in determining whether those others are residents of the locality. Neither the Board's opinion, nor the government's brief, cites *Chugach* for that proposition and the case provides no such authority. In *Chugach*, we merely observed that it was appropriate to count in the population Native residents of the locality who were not part of the qualifying group, because they, like non-Natives within the locality, would be affected by the land grant. *Chugach*, 915 F.2d at 459. The question was whether to count persons resident within the locality, not whether to expand the locality to include those persons because the grant would affect them. *Id.*

within the locality. MNI asserts that the amenities upon which the Board relied had ended by the critical date of April 1, 1970.

■ Although the Board did discuss amenities and community activities occurring at the FAA facility during the decade preceding the critical date, it also made findings that as of April 1, 1970, the FAA facility was open to and used by members of MNI. We cannot conclude that those findings were unsupported by substantial evidence. *See id.* at 1320–21.

Amenities, however, are only one factor in the *Tanalian* analysis. Relative proximity is certainly another. Because the relative proximity factor of the FAA site may be substantially affected if any change is made to the status of the Holmes residence, we remand the question of inclusion of the FAA site to the Board for reconsideration, if necessary, on remand.

## III. Appropriate Relief.

■ In considering MNI's appeal, the district court correctly identified the Board's error in considering the impact of land selection as a factor militating in favor of including the Holmeses as residents of the locality. The district court concluded that a remand to the Board was unnecessary, however, because the Holmeses met the relative proximity requirement and had provided several amenities and services to the members of MNI.

MNI argues that the district court should have remanded to the Board instead. On this point, we agree with MNI. One improper factor—impact—clearly entered the Board's decision to include the Holmeses. The Board's opinion conceded that the Holmeses "did not have the same relative proximity as others in the area," and included them for other reasons. The district court determined that, even so, the Holmeses' relative proximity was sufficient. This determination was for the Board, not the district court, to make in the first instance. *See Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

A closer question is presented by the Board's reliance on a second factor for in-cluding the Holmeses—the provision of amenities such as telephone, groceries, and power to members of the community. As we read the Board's opinion, however, this second ground was not offered as a wholly independent and sufficient reason for including the Holmeses. Both reasons were given together as supporting their inclusion. The Board's analysis of "locality" throughout its opinion indicates that the factors of relative proximity, amenities, and other aspects of community are interrelated in a total balance. Because we are unable to determine whether, absent the improper factor, the Board would have made the same decision, we remand to the Board. We are not able to strike the balance anew in the first instance. *See id.*

If, on remand, the Board determines that the balance of factors now favors exclusion of the Holmeses from the locality, then it should also redetermine the inclusion of the FAA facility. The exclusion of any extremity of the locality necessarily affects the relative proximity of the next-outermost portion. If, on the other hand, the Board determines that, after excluding from its consideration the improper factor, the Holmeses should be included, it will be unnecessary for the Board to redetermine the inclusion of the FAA facility.

## CONCLUSION

The Board's inclusion of the Holmes residence in the locality rests, at least in part, on an improper factor and must be reconsidered. Reconsideration of that inclusion may also necessitate reconsideration of the inclusion of the FAA site. Accordingly, we reverse the judgment of the district court, and vacate the Board's decision. We remand the matter to the district court with instructions to remand it to the Interior Board of Land Appeals for further proceedings consistent with this opinion.

**REVERSED AND REMANDED, WITH INSTRUCTIONS.**